SHAPIRO ET AL., APPELLANTS, *v.* BURKONS, APPELLEE.

(No. 37960—Decided December 14, 1978.)

*Mr. Ellis B. Brannon* and *Mr. William J. Novak,* for appellants.

*Mr. Gary H. Goldwasser,* for appellee.

JACKSON, J.  This is an appeal from a judgment of the Cuyahoga County Court of Common Pleas granting defendant's motion for a directed verdict. The facts of this case are as follows.

Plaintiffs-appellants, Alan and Marian Shapiro, filed this action against defendant-appellee, Dr. Harold Burkons for

damages resulting from appellee's alleged negligent failure to diagnose Marian Shapiro's breast cancer. Between 1961 and 1972, appellant Marian Shapiro saw appellee Dr. Harold Burkons, an OB-GYN specialist, for gynecological care. In June 1971, appellant visited the office of Dr. Burkons and related to him that her mother had just died from breast cancer and that she was concerned about the consequences of breast cancer herself. She remarked about the increase in size of her right breast and that she wanted him to examine her breast every six months instead of annually. She told Dr. Burkons: "I'm putting myself in your hands. You are the one who will be responsible for me."

Six months later, in December 1971, appellant saw Dr. Burkons and expressed concern that her right breast was getting larger. Dr. Burkons' records indicate that he examined appellant's breasts and diagnosed the presence of cysts with a slightly more prominent mass under the areola (nipple area). Dr. Burkons suggested a mammogram. Appellant went to the radiologists, Hill and Thomas, where a mammogram was taken and which subsequently proved negative for carcinoma. A biopsy was not performed at this time.

Appellant next saw Dr. Burkons on May 2, 1972. Prior to this visit, appellant had expressed to Dr. Burkons during a telephone conversation that her right breast was still increasing in size. Appellant testified that she was examined during the May 2, 1972, visit and that Dr. Burkons had assured her that all she had were cysts, and that the mammogram she had previously taken showed nothing unusual in the breast. Dr. Burkons then gave appellant an American Cancer Society breast self-examination booklet.

In August 1972, appellant visited Dr. Burkons at his office for the purpose of getting a vaginal culture due to a monilia infection which she had. She testified that, although her breast was steadily growing larger, she said nothing about this to Dr. Burkons during this examination for the reason that Dr. Burkons had told her not to worry. An examination of appellant's breasts was not made by appellee during this visit.

On November 21, 1972, appellant again visited Dr. Burkons for an examination. After examination of appellant's right breast, appellant testified that Dr. Burkons

said: "The breast is getting larger," and that he noticed a hard lump. Dr. Burkons' records indicate a mass of cysts, about 5 x 5 cms., had developed in the lower part of appellant's right breast.[1] This mass is to be differentiated from the lesion first noticed under the areola in December 1971. Appellant also testified that by this time she was also experiencing pain associated with the right breast.

Dr. Burkons attempted a needle aspiration to draw fluid from the mass which would indicate cysts. However, Dr. Burkons was unable to obtain any fluid. Dr. Burkons then suggested another mammogram which again showed no cancer. When appellant continued to complain to Dr. Burkons about pain in her right breast and armpit, he sent her to Dr. Jones at St. Luke's Hospital. Appellant made an appointment with Dr. Jones and an examination was performed. Appellant subsequently underwent an operation in December 1972, ostensibly to have the cysts removed. However, during the operation, a malignant tumor was discovered and a radical mastectomy performed.

Following the mastectomy, appellant underwent a course of radiological treatment. However, her condition started to deteriorate again, and in September 1976, she was examined by Dr. Marshall, an endocrinologist, at University Hospitals. Renewed cancerous activity was detected in her spine and Dr. Marshall placed appellant on a regimen of chemotherapy. Further X-rays revealed that the cancer had metastasized (i.e., spread) to appellant's hip.

Dr. Marshall, who was treating appellant at the time of trial, testified as to her diagnosis and present prognosis. Based upon appellant's condition known at the time, including the rate of metastasis of the cancer, Dr. Marshall testified that her prognosis, based upon reasonable medical certainty, was twelve months.

Dr. Sternen, one of appellants' expert witnesses, testified that during the December 1971 examination, the finding of a mass or lesion under the areola which stood out from the rest of the breast tissue was a discovery significant enough to justify a biopsy of that mass.[2] He testified that a

[1] Dr. Jones, the surgeon who later performed the radical mastectomy on plaintiff, estimated the size of the lesion in the lower part of the right breast at 4 x 4 cm.

[2] Dr. Sternen testified that as far as he was concerned, "December 1971 was the critical time."

failure to perform a biopsy under those circumstances violated the standard of care owed to such a patient according to the medical community of obstetrician-gynecologists. Dr. Sternen further testified that a mammogram performed on a woman of appellant's age—early thirties at the time—is inaccurate since the breast tissue is dense tending to obscure any tumors. The fact a mammogram is negative does not necessarily mean that carcinoma is not present in the breast. Dr. Sternen also stated that had the cancer been discovered as early as December 1971, appellant's present prognosis of twelve months would be better due to the smaller size of the lesion.

Dr. Tweeddale, another expert witness for appellants, testified that appellant's cancer was a comedo-type carcinoma, which is a slow growing type. Dr. Tweeddale further testified that the earliest he would have performed a biopsy was in May 1972, assuming the lump in the lower part of the right breast was palpable (*i.e.,* hard to the touch) and not diffuse. Moreover, Dr. Tweeddale stated that if a diagnosis of cancer was made as early as December 1971, appellant's chances for a "five year survival rate" would have perceptibly improved.

Following the conclusion of appellants' case-in-chief, defendant-appellee moved for a directed verdict. The trial court, in granting the motion, stated the following in its opinion:

"As to the first issue, the Court finds that the plaintiffs have adduced some probative evidence as to the existence of negligence and thus the plaintiffs have clearly met their burden as to the defendant's failure to follow standard and acceptable medical practice sufficient to warrant the submission of said issue to the jury.

"As to the second issue, after construing the evidence most strongly in favor of the plaintiffs, the Court finds that the evidence adduced by the plaintiffs falls so far short of establishing that the alleged negligence of the defendant was the proximate cause of plaintiff's injury that this Court is compelled to hold *as a matter of law* that reasonable persons considering such issue must come to but one conclusion, i.e. that the defendant Burkons' conduct was not the proximate cause of plaintiff's misfortune." (Emphasis added.)

Appellants filed a timely notice of appeal and present two assignments of error for review:

"1. The trial court erred when it directed a verdict on proximate cause in favor of the defendant in the face of plaintiff's evidence that the defendant physician negligently shortened plaintiff's survival rate.

"2. The trial court erred when it directed a verdict on proximate cause in favor of the defendant physician because a fair inference from plaintiff's proof was that plaintiff's cancer metastasized to her lymph nodes after defendant's negligent failure to biopsy her breast."

In order for the trial court to properly grant a motion for a directed verdict at the close of the opponent's evidence, Civil Rule 50 provides that the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, must find that upon any determinable issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.

The Ohio Supreme Court has stated the general rule of law applicable in medical malpractice cases as follows:

"1. In order to establish medical malpractice, it must be shown by a preponderance of evidence *that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things."* (Emphasis added.) *Bruni* v. *Tatsumi* (1976), 46 Ohio St. 2d 127, paragraph one of the syllabus.

The record clearly establishes sufficient probative evidence as to the failure to use due care by appellee to submit the issue of negligence to the jury.

In *Cooper* v. *Sisters of Charity of Cincinnati* (1971), 27 Ohio St. 2d 242, the Ohio Supreme Court, in addressing the issue of proximate cause where medical malpractice is alleged, held that such issue in a wrongful death action can be sub-

mitted to the jury *only if,* in giving plaintiff's evidence every favorable consideration, there is sufficient evidence "that defendant's negligence, *in probability,* proximately caused the death." 27 Ohio St. 2d at 252.

Moreover, this court has held that:

"In a malpractice action against a physician involving a claim of negligent treatment with fatal results, it would be reversible error to arrest the evidence from the jury at the close of plaintiff's case in chief and render judgment for defendant physician, where viewing plaintiff's evidence in the light most favorable to her contention she has presented a chain of circumstances and events *from which an inference may reasonably arise that the physician was negligent and that such negligence was the proximate cause of such death.*" (Emphasis added.) *Morgan* v. *Sheppard* (1963), 91 Ohio Law Abs. 579 (citing *Hubach* v. *Cole* (1938), 133 Ohio St. 137).

Therefore, the primary issue to be determined by this court in the case at bar is whether after construing the evidence adduced most strongly in favor of the appellants, an inference may reasonably arise that the alleged negligence by appellee was, *in probability,* the direct and proximate cause of appellant's reduced life span. Stated differently, the issue is whether appellant adduced sufficient probative evidence from which it may be inferred that her medical prognosis would probably have been better were it not for the alleged negligence of the appellee.

For the reasons set forth below, we find that the evidence presented at trial, considered most strongly in favor of appellant, is insufficient to present to the jury the issue of proximate cause.

Appellants Alan and Marian Shapiro contend that there was sufficient evidence establishing at least an inference that the alleged negligence of appellee was the proximate cause of appellant's injury, to wit: an abbreviated life span.

Appellee Dr. Burkons argued, however, that the testimony of appellants' expert witnesses constituted speculation and not probabilities. Appellee contends that the expert witnesses, based on the facts adduced, could not state with reasonable certainty an opinion that if a biopsy had been performed on appellant either in December 1971 or May 1972, it would have diagnosed cancer. Therefore, it is con-

tended by appellee that the testimony of the expert witnesses leaves to mere speculation by the jury whether the appellant's life expectancy would have been increased even had a biopsy been performed in December 1971 or May 1972.

Plaintiffs-appellants presented evidence on the issue of proximate cause solely through the testimony of Drs. Sternen and Tweeddale. Dr. Tweeddale testified that by taking the size of the mass at the time it was surgically removed (5 cm.) in December 1972, and using the "doubling theory," he was able to project back in time with reasonable medical certainty to determine the size of the mass in December 1971. Dr. Tweeddale then stated that based upon his calculations he was able to conclude with reasonable medical certainty that the mass in appellant's right breast was approximately 2 cm. in December 1971. Dr. Tweeddale then testified as follows:

"Q Doctor, I would like to ask you a question which we need your scientific medical opinion, and I will ask it this way. Do you have an opinion based upon reasonable medical certainty as to whether or not, had the cancer been diagnosed on December 6th, 1971, that Marian's prognosis for survival would be greater than it is today with the prognosis of twelve months?

"A Yes.

"Q And what is that opinion?

"A That her survival rate would have been better based on the probability of decreased size. The smaller the cyst the fewer the axillary metastasis, or spread under the arm, the greater the chance of the lesion being localized. The more localized a lesion the better the five year survival rate.

"Q Now, if you consider the further fact of the comedo type of carcinoma, do you have an opinion based upon reasonable medical scientific certainty as to whether or not in December of 1971 that the small lesion which you have described would then also project a probable survival rate of ten years, or in the neighborhood of ten years for Marian Shapiro in the absence of any lymph nodes being enlarged or found at that time?

"Mr. Goldwasser: Objection. * * *

"The Court: You may answer the question, Doctor.

"A The answer is had a tiny lesion be identified in December of 1971 and removed, that her ten year survival

rate would have been exceptionally high provided axillary metastasis had been as stated in the question."

Dr. Sternen also testified to the effect that had the diagnosis been made in December 1971, appellant's prognosis would have improved:

"Q Doctor, I have a hypothetical question I have prepared, which I would like to in this instance ask you to assume the following facts as being true.

"I would like to have you assume that Marian Shapiro, she has testified, had small breasts, and then I would like to first ask you this question before the hypothetical; do you have an opinion based upon reasonable medical certainty as to whether or not the cancer had been diagnosed on December 6th, 1971, that Marian Shapiro's prognosis for survival would be greater than it is today with a prognosis given by Doctor James Marshall of twelve months?

"A If the diagnosis had been made in December of 1971 the prognosis would be better.

"Q What are the reasons for that opinion?

"A The area in question was smaller at that time, and there were no nodes or positive nodes made mention of on physical examination. Nodes in the axilla."

Appellee argues that the medical testimony recited above is speculative for the reason that the witnesses did not, with reasonable probability, express an opinion that a biopsy performed on the lesion under the areola in appellant's right breast in December 1971 would have resulted in a diagnosis of cancer. This argument is well taken. On direct examination neither Dr. Tweeddale nor Dr. Sternen testified with any reasonable medical certainty or probability that had the mass first noticed by appellee under the areola in December 1971 been biopsied, a diagnosis of cancer would have resulted. The reason for this is that the cancerous mass which was removed during the surgery was differentiated from the lesion or mass noticed under the areola. There was no testimony offered which tended to show that the mass under the areola was also cancerous, or that the cancerous mass, which was removed from the lower portion of the breast, extended to the areola. Moreover, upon cross-examination, Dr. Tweeddale could not state with reasonable probability that if the lesion under the

areola was biopsied in December 1971, it would have diagnosed cancer:

"Q Doctor, when cancerous tissue is removed, the pathologist sees some benign tissue around the entire mass, generally isn't that true?

"A Almost always.

"Q And benign is what for the jury's benefit?

"A Benign is non-cancerous tissue.

"Q Now, bear in mind that statement on December 6, 1971, Dr. Burkons, according to his note felt a slightly more prominent cyst under the areola. And assume for the purpose of my question that he estimated it to be three to four millimeters in size directly under the areola. Assume further that that cyst under the areola was not palpable on May 2, 1972, and assume that there is a five by five centimeter mass which was palpable in the lower portion of the breast, November 21, 1972. Dr. Tweeddale, can you state with reasonable probability that if the cyst under the areola which was three to four millimeters in size, hypothetically, if that was biopsied in December of 1971, if it would have diagnosed cancer?

"A Probably not."[3]

Additionally, although Dr. Sternen testified initially on cross-examination that a biopsy of the mass under the areola would have detected cancer, he changed his view upon clarification of the question:

"Q All right. Doctor, in view of the slightly more prominent mass being under the areola, which we know from Dr. Burkons' records, which is in an area other than that area where breast cancer was later diagnosed; is it not true that most likely if a biopsy was taken of that mass under the areola, it would have proven to be benign in view of the fact that the cancerous lesion was in the lower portion of Mrs. Shapiro's breast?

"A *I don't know how far that cancerous lesion extended.* It was five by eight centimeters,[4] which is a fairly good size lesion.

---

[3] When he was deposed, Dr. Burkons stated that he estimated the size of the slightly more prominent mass under the areola to be between three and four millimeters.

[4] A careful review of the record indicates that Dr. Sternen's estimate of the size

"Q Also true, it could not cover quite a bit of area.

"A Five by—

"Q Let me read it for you. According to Dr. Jones in the St. Luke's Hospital record on his discharge, four by four centimeter mass in the lower half of the right breast which was not affixed to the skin or chest wall. *Now, in view of the mass being in the lower half of the right breast and more prominent mass as seen by Dr. Burkons in his records under the areola, isn't it more likely that he would have biopsied the mass under the areola and it would have been benign?*

"A *I can't say that.*

"Q *Can you say with any medical certainty it would have shown cancer?*

"A *I think it would have.*

"Q You think it would have?

"A Yes.

"Q *On what basis do you make that statement?*

"A *Because of the size of the mass that was removed at the time of surgery.*

"Q *Was there ever any indication that that mass came out into the area of the areola?*

"A *I don't know if it was mentioned on the report. I don't know if it was mentioned on the—*

"Q *For the purpose of my question, assume that that did not come up under the areola, do you still feel that with a reasonable degree of scientific certainty, a biopsy under the areola would have shown cancer in December of 1971?*

"A *If the mass did not come up to the areola, yes.*

"Q *You still think it would have?*

"A Reword that question. * * *

"Q Doctor, I want you to assume that clinically from feeling, from palpation, that on November 21, 1972 the five by five centimeter mass felt by Dr. Burkons did not come under the areola, it was below in the lower portion of the breast. I want you to assume that.

"A Okay.

"Q *Now, assuming that we have a three to four*

---

of the cancerous lesion was based upon a statement in the pathology report from St. Luke's Hospital regarding Biopsy of Right Breast of Marian Shapiro, to wit: "Received in the fresh state are two pieces of soft tissue which measure 2x2x0.5 cm and 8x5x2 cm in greatest dimensions.* * *"

*millimeter cyst under the areola in December of 1971, is it
your testimony with a reasonable degree of scientific certain-
ty that a biopsy of that cyst under the areola would have pro-
ven cancerous?*

Mr. Brannon: Objection.

The Court: Overruled.

"A *I can't recall making that assumption. I hadn't per-
formed the surgery, and the doctor made an incision right
around the lower margin of the areola and removed this mass
through this incision. He must have been getting some of the
sub-areola tissue with it.*

"Q *Is your answer you can't answer my question?*

"A *Yes, I can't.*

"Q *You can't answer whether it would have been benign
or not.*

"A *No, I don't think so.*" (Emphasis added.)

In *Pope* v. *Mudge* (1923), 108 Ohio St. 192, the plaintiff,
who was seeking relief on the ground of fraud, testified in the
form of a deposition taken shortly before his death and
rendered answers inconsistent with his prior conduct and
with other evidence. The Ohio Supreme Court stated in
paragraph 2 of its syllabus, that:

"If, in ruling upon a motion to direct a verdict, the court
is required to detect the truth from conflicting evidence of
the same or different witnesses, the motion should be over-
ruled."

The instant matter may be distinguished from *Pope,
supra.* The conflict in Dr. Sternen's testimony regarding the
probability of detecting cancer under the areola in December
1971 occurred only during cross-examination. The record
does not disclose any conflict on this issue between his
testimony on direct and that on cross examination for the
reason that Dr. Sternen was not called upon to address this
issue on direct. More importantly, the reason or basis for the
apparent conflict in his testimony was an assumption by Dr.
Sternen that the size of the cancerous lesion at the time of
surgery suggested that it had extended up under the areola.
When this assumption, which was not in evidence, was
removed from Dr. Sternen's consideration in a subsequent
hypothetical question, he ultimately changed his answer.
Therefore, unlike *Pope,* where the conflicting evidence was

unresolved and consequently a question of fact for the triers of the facts, the apparent "conflict" in Dr. Sternen's testimony did not require the exercise of the function of the triers of fact since the basis for the conflict was ultimately resolved. See *Winkler* v. *Columbus* (1948), 149 Ohio St. 39, 44, where the Supreme Court stated that: "Both paragraphs of the syllabus of [*Pope, supra*] should be limited to the peculiar facts of that case."

Thus, Dr. Sternen could not testify that a biopsy of the mass under the areola would, with reasonable probability, have detected cancer. Therefore, using the test in *Cooper*, the case was properly arrested from the jury since there was insufficient evidence tending to show that appellee's alleged negligent failure to perform a biopsy denied appellant "the probability" of a lengthier survival rate.

As stated by Judge Duncan of the Ohio Supreme Court:

"A rule, which would permit a plaintiff to establish a jury question on the issue of proximate cause upon a showing of a 'substantial possibility' of survival, in our judgment, suffers the same infirmity as a rule which would permit proof of a 'chance of recovery' to be sufficient. While the substantial possibility concept appears to connote a weightier burden than the chance of recovery idea, both derogate well established and valuable proximate cause considerations. Traditional proximate cause standards require that the trier of the facts, at a minimum, must be provided with evidence that a result was more likely than not to have been caused by an act, in the absence of any intervening cause.

"Lesser standards of proof are understandably attractive in malpractice cases where physical well being and life itself are the subject of litigation. The strong intuitive sense of humanity tends to emotionally direct us toward a conclusion that in an action for wrongful death an injured person should be compensated for the loss of any chance for survival, regardless of its remoteness. However, we have trepidations that such a rule would be so loose that it would produce more injustice than justice." *Cooper* v. *Sisters of Charity of Cincinnati* (1971), 27 Ohio St. 2d 242, 251, 252.

A plaintiff in this kind of a case has the opportunity not only to select expert witnesses to testify on her behalf but also to frame hypothetical questions calling for answers

which will definitely support her claim of proximate cause. If there was any merit to the claim of plaintiff-appellant, qualified experts that she selected to support her claim should have been able to testify at least that the alleged negligence by defendant-appellee was, in probability, the direct and proximate cause of appellant's abbreviated life span. Such testimony would have at least made the issue a jury question.

The only conclusion to be drawn from the testimony of Drs. Sternen and Tweeddale is that there were no facts available in this case from which a juror could infer that appellant's survival rate would have more likely than not been better because cancer would have been detected if the biopsy had been performed in December 1971.

Therefore, we find appellants' first assignment of error not well taken.

In the second error assigned by appellants it is argued that "a fair inference from plaintiffs' proof was that plaintiff's cancer metastasized to her lymph nodes after defendant's negligent failure to biopsy her breast." The record does not support this assertion.

First, we have already determined there was insufficient evidence tending to show or infer that even if a biopsy had been performed on the lesion under the areola in December 1971, it would have diagnosed cancer. Whether the cancer had metastasized prior to December 1971, or thereafter, is moot insofar as proximate cause is concerned.

Moreover, Dr. Sternen testified on cross-examination that he could not say with any reasonable degree of certainty as to what point in time the cancer in appellant's right breast had metastasized. Dr. Tweeddale also testified that by May 1972, when the mass in the lower portion of the right breast was, according to his calculations, approximately 2.5 cm. there is a "good chance" of metastasis at that point. Therefore, it was unlikely that even if a biopsy was performed and cancer diagnosed, metastasis may have already taken place. Although appellants argue the fact that nodular development was not mentioned in Dr. Burkons' records for the December 1971 examination and that this infers a lack of metastasis at that point, this assertion is simply not supported by the evidence. There was insufficient evidence ad-

duced from which it could reasonably be inferred that metastasis had, *in probability,* taken place as early as December 1971.

Therefore, we find appellants' second assignment of error not well taken.

Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

CORRIGAN, C. J., and PRYATEL, J., concur.