**MILLER, Appellant,**

v.

**PAULSON, Appellee.**

[Cite as *Miller v. Paulson* (1994), 97 Ohio App.3d 217.]

Court of Appeals of Ohio,
Franklin County.

No. 93APE09–1285.

Decided Sept. 20, 1994.

*Wolske & Blue, Walter J. Wolske, Jr., Michael S. Miller* and *Gerald S. Leeseberg,* for appellant.

*Lane, Alton & Horst, Jack R. Alton* and *Theodore M. Munsell,* for appellee.

PEGGY BRYANT, Judge.

Plaintiff-appellant, Mary Kay Miller, appeals from a judgment of the Franklin County Court of Common Pleas granting the motion of defendant-appellee, George W. Paulson, M.D., for judgment notwithstanding the verdict, and conditionally granting his motion for a new trial.

During the spring of 1979, plaintiff began experiencing dizzy spells and difficulty in closing her right eye. On November 9, 1979, plaintiff consulted defendant, a neurologist, regarding her symptoms. Following a neurological examination and CAT scan, defendant tentatively diagnosed plaintiff's condition as Bell's palsy.

Defendant examined plaintiff again on January 11, 1980, but found nothing which caused him to change his diagnosis. Plaintiff's symptoms continued to worsen, and on February 13, 1980, defendant admitted plaintiff to Riverside Methodist Hospital for a series of tests. All test results were normal and defendant discharged plaintiff from the hospital on February 18, 1980, "somewhat uncertain as to what [was] going on." (Letter from defendant to plaintiff's ophthalmologist, February 19, 1980.) Plaintiff's next appointment with defendant in April 1980 again failed to bring about any change in defendant's diagnosis or treatment of plaintiff.

Over the next year, plaintiff continued to experience intermittent dizzy spells, developed a twitch in the right corner of her mouth and lost all ability to close her right eye. On March 30, 1981, defendant again examined plaintiff. Following the examination, defendant wrote to plaintiff explaining that although her condition was "a bit more than a routine Bell's Palsy," he did not think that any further tests were indicated at that time.

In early November 1981, plaintiff had her final scheduled appointment with defendant. Following the appointment, defendant wrote to plaintiff as follows:

" * * * I see nothing to make me think of a tumor or MS but I do think you could have some scar tissue forming around the facial nerve and I wonder, if in fact, surgical exploration of this area might not be desirable eventually."

Defendant did not pursue exploratory surgery and never referred plaintiff to a surgeon.

Plaintiff was examined by Dr. William Hunt, a neurosurgeon, on April 13, 1983. Following the examination, Dr. Hunt wrote to defendant, stating that "[t]he nature of onset and progression suggests a benign tumor."

On May 17, 1983, Dr. Mark May, a neurosurgeon practicing at the Eye and Ear Hospital of Pittsburgh, operated on plaintiff and removed a "tumor * * * from [plaintiff's] facial nerve." (Dr. May's postoperative report.) Dr. May, however, did not perform a nerve graft in an attempt to restore some function to plaintiff's right facial muscles; rather, following the surgery to remove the "tumor," Dr. May referred plaintiff to Dr. Daniel Baker, a plastic surgeon, who performed a series of operations intended to alleviate some of the disfiguring effects of plaintiff's facial paralysis.

On May 11, 1990, plaintiff brought a medical malpractice action against defendant in the Franklin County Court of Common Pleas, alleging that she had entered into a physician-patient relationship with defendant in 1979 which continued until May of 1983, that during the relationship defendant negligently had failed to diagnose the presence of a tumor on her seventh facial nerve, and that defendant's negligence had proximately caused her to suffer permanent paralysis of the right side of her face.

Beginning on April 5, 1993, a jury trial was held. On April 15, 1993, the jury returned a verdict for plaintiff in the amount of $800,000; the trial court journalized the verdict on April 29, 1993. On May 12, 1993, defendant filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial. The trial court granted defendant's motion for judgment notwithstanding the verdict and conditionally granted defendant's motion for a new trial.

Plaintiff appeals, assigning the following errors:

"I. The trial court erred to the substantial prejudice of plaintiff-appellant in granting the motion of defendant-appellee for judgment notwithstanding the verdict on the basis of proximate cause, *i.e.*, on the basis that the plaintiff-appellant failed to disprove that a subsequent treating physician did not negligently fail to remedy the harm which resulted from the negligence of the defendant-appellee.

"II. The trial court erred to the substantial prejudice of plaintiff-appellant in conditionally granting the motion of defendant-appellee for a new trial on the

basis that the jury's finding that Mary Kay Miller had a tumor which the defendant-appellee negligently failed to diagnosis [*sic* ] was against the manifest weight of the evidence.

"III. In the event that this court reverses the judgment not withstanding [*sic* ] the verdict, but affirms the new trial on the basis that the jury's finding that Mary Kay Miller had a tumor which the defendant-appellee negligently failed to diagnosis [*sic* ] was against the manifest weight of the evidence, it should remand this case for a new trial only on the issue of whether Mary Kay Miller had a tumor, and not, for example, the issue of the amount of Mary Kay Miller's damages.

"IV. The trial court erred to the substantial prejudice of the plaintiff-appellant in excluding the testimony of Dr. Cox.

"V. The trial court erred to the substantial prejudice of plaintiff-appellant in refusing to admit into evidence Dr. May's letter dated May 2, 1983, to Dr. Charles." [1]

In her first assignment of error, plaintiff challenges the trial court's conclusion that she presented no material evidence on the issue of proximate cause and asserts that the trial court thus improperly granted judgment notwithstanding the verdict for defendant. In addressing this issue, we note that defendant does not appeal the verdict concerning the standard of care or his breach of that standard. Thus, for purposes of this appeal, defendant's negligence is established. The issue to be resolved surrounds only proximate cause.

In considering a motion for judgment notwithstanding the verdict under Civ.R. 50(B), a trial court "must assume the truth of the plaintiffs' evidence as shown by the record, grant such evidence its most favorable interpretation, and consider as established every material fact which the evidence tends to prove." *McComis v. Baker* (1974), 40 Ohio App.2d 332, 335, 69 O.O.2d 304, 305, 319 N.E.2d 391, 393. " 'Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination' " in ruling upon such a motion. *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 137, 17 OBR 281, 282, 477 N.E.2d 1145, 1147. Further, proximate cause ordinarily is a question of fact to be determined by the jury; thus, a reviewing court should not set aside the verdict unless it is against the manifest weight of the evidence. *Poske v. Mergl* (1959), 169 Ohio St. 70, 8 O.O.2d 36, 157 N.E.2d 344. A verdict is not against the manifest weight of the evidence if it is supported by competent, credible evidence.

---

1. Plaintiff's fifth assignment of error was advanced pursuant to a motion for leave to supplement filed March 10, 1994 and granted March 15, 1994.

See, *e.g., C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578.

In granting defendant's motion for judgment notwithstanding the verdict, the trial court framed the causation issue as "whether the delay in diagnosis of the tumor somehow prevented Dr. May from performing the nerve graft." [2] Finding that the record contained no evidence indicating why Dr. May did not perform a nerve graft in 1983, the trial court concluded that plaintiff had failed to present sufficient evidence to send the issue of proximate cause to the jury.

▮ In a medical malpractice action premised on a failure to properly diagnose or treat a medical condition which results in a patient's death, the proper standard of proof on the issue of causation is whether with proper diagnosis and treatment the patient *probably* would have survived. "Probably" is defined as "more likely than not" or a greater than fifty percent chance. *Cooper v. Sisters of Charity of Cincinnati, Inc.* (1971), 27 Ohio St.2d 242, 253–254, 56 O.O.2d 146, 152, 272 N.E.2d 97, 104–105; *Taylor v. C. Lawrence Decker, M.D., Inc.* (1986), 33 Ohio App.3d 118, 120, 514 N.E.2d 754, 756. The same standard of proof applies to malpractice cases, such as the present case, which allege that a failure to diagnose or treat a medical condition caused a permanent or irreversible injury other than death. *Schwimmer v. Bowsher* (Feb. 25, 1993), Franklin App. No. 92AP–1140, unreported, 1993 WL 51173; see, also, *Shapiro v. Burkons* (1978), 62 Ohio App.2d 73, 16 O.O.3d 175, 404 N.E.2d 778.

▮ Further, plaintiff was not required to present evidence fixing the precise time of the last chance to successfully diagnose and treat her condition. Instead, she was required to prove simply that the time of last chance had passed, *i.e.*, that the opportunity to achieve the results obtainable at the time of defendant's negligence no longer existed. In cases involving death, the evidence is clear that the time of last chance has passed, as the injured party has died. *Cooper, supra; Wells v. Miami Valley Hosp.* (1993), 90 Ohio App.3d 840, 631 N.E.2d 642. However, in a failure-to-diagnose case involving a nonfatal injury, such as the instant case, a plaintiff must show through expert testimony that the last chance to treat the condition with the same possibility and degree of success as was probable at the time of the alleged malpractice has passed at the time of trial.

---

**2.** Dr. May's actual treatment of plaintiff arguably is irrelevant to the question of whether defendant proximately caused plaintiff's present condition. "[T]he rule in Ohio is that if an injury is the result of neglect to perform a common duty resting on two or more persons, the injured party may, at his election, sue all of the parties owing the common duty jointly, or sue each separately, although there may have been no concert of action between them." *Blanton v. Sisters of Charity* (1948), 82 Ohio App. 20, 23, 37 O.O. 355, 356, 79 N.E.2d 688, 690. Therefore, plaintiff may be able to sue defendant for all of her damages, irrespective of whether Dr. May's treatment was the proximate cause of those damages. The issue instead is whether plaintiff's condition was subject to correction at the time Dr. May saw her.

Stated differently, given the evidence in this case, plaintiff had to prove that her present condition was no longer subject to correction.

Thus, the issue under plaintiff's first assignment of error is whether plaintiff presented any competent, credible evidence showing that her present medical condition is not correctable and that the condition "probably" would have been better but for defendant's negligence. *Shapiro, supra,* 62 Ohio App.2d at 78, 16 O.O.3d at 178, 404 N.E.2d at 781.

In that regard, plaintiff's evidence on the issue of proximate cause consisted largely of the expert testimony of Dr. Jack Pulec, a leading neurologist. Dr. Pulec testified to a reasonable degree of medical certainty that, had plaintiff been properly diagnosed, treated and surgically attended to in the fall of 1981, she would have had a fan spring put in place, had a tumor removed, and a facial nerve grafted with a splice. As explained:

"[S]he could have expected beginning recovery of facial function, actual motion of her face, approximately nine or ten months after the time of the graft.

"Based on the other cases of facial nerve neuroma like that, she could have an average of eighty percent motion of her face.

" * * *

"So I would say she would have a chance for eighty percent facial motion with synkinesis, or mass action. These are two similar terms.

"In other words, this overall facial motion."

Further, on redirect, Dr. Pulec testified that plaintiff would have had "over ninety percent chance * * * to have eighty percent return of facial nerve strength" had her condition been diagnosed and treated in 1981.

As to whether plaintiff's condition was subject to correction, or, as the trial court framed the issue, whether Dr. May could have successfully performed surgery in 1983, plaintiff presented considerable evidence suggesting that cosmetic surgery was performed in 1983 because her condition was not otherwise treatable. However, she also presented direct evidence respecting the permanency of plaintiff's facial paralysis in a letter written by Dr. Hunt, the neurosurgeon who examined plaintiff in 1983, prior to Dr. May's surgery on plaintiff. In his letter, Dr. Hunt stated that "[t]he nature of onset and progression [of plaintiff's condition] suggests a benign tumor [of the seventh facial nerve]." Dr. Hunt then states that "I don't think we can restore any function that has been lost." (April 13, 1983 letter from Dr. William Hunt to Dr. George Paulson.) Dr. Hunt's letter satisfies the *Cooper* probability standard, and constitutes some competent, credible evidence that plaintiff's facial paralysis is not correctable. See *Galletti v. Burns Internatl.* (1991), 74 Ohio App.3d 680, 683, 600 N.E.2d 294,

296 (medical expert's testimony that "I think it was definitely due to the stress that he experienced at work" held sufficient to satisfy the *Cooper* probability standard).

Given that Dr. Hunt's letter satisfies the *Cooper* probability standard and indicates that plaintiff's paralysis is permanent and irreversible, that evidence of proximate cause, even if minimal, coupled with the testimony of Dr. Pulec, is sufficient to support the jury's verdict. The trial court improperly granted defendant's motion for judgment notwithstanding the verdict. Plaintiff's first assignment of error is sustained.

Plaintiff's second assignment of error challenges the trial court's conditional grant of defendant's motion for a new trial on the grounds that the jury's verdict was against the manifest weight of the evidence.

Civ.R. 59(A)(6) provides as follows:

"A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

" * * *

"(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case[.]"

When a party files a motion for a new trial asserting that the judgment is not sustained by the weight of the evidence, a duty devolves upon the trial court to review the evidence presented at trial and to pass upon the credibility of the witnesses and the evidence in general. *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 92, 52 O.O.2d 376, 381, 262 N.E.2d 685, 691. The trial court is in the best position to decide issues of fact and is therefore vested with broad discretion in ruling upon new trial motions made pursuant to Civ.R. 59(A)(6). *Monroe v. Ohio Dept. of Rehab. & Corr.* (1990), 66 Ohio App.3d 236, 240, 583 N.E.2d 1102, 1104. As a result, the trial court's decision to grant a motion for a new trial based upon the weight of the evidence will be overturned on appeal only where the trial court abused its discretion in granting the motion. *Rohde, supra,* 23 Ohio St.2d at 90, 52 O.O.2d at 380, 262 N.E.2d at 690.

Nonetheless, a trial court may not set aside a jury verdict upon the weight of the evidence based upon a mere difference of opinion with the jury; doing so constitutes an abuse of discretion by the trial court. *Id.* at 92, 52 O.O.2d at 381, 262 N.E.2d at 691. The jury's function is to weigh the evidence in the first instance, and a trial court may not usurp that function. *Id.* Thus, while the appellate court must give deference to a decision of the trial court respecting the

weight of the evidence, the appellate court must also conduct an inquiry sufficient to ensure that the trial court has not encroached on the jury's factfinding function. *Bland v. Graves* (1993), 85 Ohio App.3d 644, 650, 620 N.E.2d 920, 923.

Here, the trial court concluded that the jury's determination that plaintiff had a tumor on her seventh facial nerve, expressed in response to a jury interrogatory, was contrary to the overwhelming testimony. Specifically, the trial court found that:

"Evidence of tumor was contained in Dr. May's records. While pathology records refer to a neuroma, evidence suggests the term was not used to imply a tumor. Evidence that no tumor was present was elicited from Drs. Mandybur, Martinez and Welling. As Dr. May did not testify, the jury nor the Court was able to assess his credibility and determine the weight to be accorded his testimony. However, given that May's indication in his records of a tumor was not based upon a pathologist's finding, his conclusions as stated in the records should be accorded little weight."

The record contains essentially two pieces of evidence which support presence of a tumor on plaintiff's seventh facial nerve. Initially, the letter from Dr. Hunt to defendant states that "[t]he nature of onset and progression suggest a benign tumor." Second, the business records [3] of the Eye and Ear Hospital of Pittsburgh, the hospital where Dr. May operated on plaintiff, contain the postoperative reports of Dr. May and neuropathologist Dr. Augusto Julio Martinez; both reports indicate that a tumor was present on plaintiff's seventh facial nerve.

Specifically, Dr. May's postoperative report describes the surgery performed on plaintiff, in pertinent part, as follows:

" * * * A simple mastoidectomy was performed. The facial nerve was followed from the stylomastoid foramen, through the retrofacial recess underneath the incus to the area just past the cochleariform process. *At this point, a mass was noted.* * * * *Finally, when it was determined that the tumor was arising from the facial nerve and, therefore, most likely a schwannoma,* the facial nerve was lifted out of the canal in its tympanic segment, to the geniculate ganglion and then freed up from the labyrinthine portion and removed with cupped forceps. * * * " (Emphasis added.)

Clearly, Dr. May's report constitutes evidence that plaintiff had a tumor, most

---

**3.** Defendant stipulated to the authenticity of these business records and the trial court admitted them pursuant to Evid.R. 803(6) over defendant's objection. Defendant has not challenged that ruling on appeal.

likely a "schwannoma"[4] on her seventh facial nerve.

Dr. Martinez's postoperative pathology report was prepared based upon his microscopic examination of five slides containing tissue samples taken from tissue removed by Dr. May during plaintiff's surgery. The diagnostic section of his report indicates that the second and fifth tissue samples examined revealed the presence of a neuroma on plaintiff's right facial nerve. According to Stedman's Medical Dictionary, the term "neuroma" is "[a]n old, general term for any neoplasm derived from cells of the nervous system." *Id.* at 947. Stedman's Medical Dictionary in turn defines a "neoplasm" as a type of tumor. *Id.* at 931.

While Dr. Martinez's report in itself provides some evidence that a tumor was present on plaintiff's seventh facial nerve, his testimony given as defendant's witness offers an explanation for the report:

"A. When I use the term 'neuroma', I didn't imply that the etiology of this lesion is a tumor itself.

"When I use the term 'neuroma', I imply that this is definitely an abnormal nerve, the etiology of which can be many. It can be a compression of the nerve, can be infections, trauma, tumor or many other causes.

"Q. When you use the word 'neuroma' that's what that means?

"A. Yes.

"Q. It's a nonspecific finding?

"A. Exactly, nonspecific finding.

" * * *

"Q. So what you did is you found a lesion in the nerve?

"A. Yes, sir.

"Q. And you attached the name 'neuroma' because it describes that you found a lesion, but it's nonspecific as to the etioloty [*sic*]; is that correct?

"A. Exactly."

When he was asked whether he had found any tumor cells in the specimen, Dr. Martinez responded:

"A. I cannot tell you. I believe there is no pathologist who can tell you what the tumor cell in the peripheral nerve lesion is because they can be confused with changes in the cell which are due to trauma, compression, infections. So there is no specific feature who can tell you that this is a tumor cell.

---

4. Stedman's Medical Dictionary (5 Ed.1982), defines a "schwannoma" as being either a "neurofibroma" or a "neurilemoma," both of which are in turn defined as types of benign nerve tumors. *Id.* at 944, 946.

"The changes in the cell are nonspecific. It's a matter of interpretation, a matter of clinical history, which—by the way, when I saw this slide in nineteen eighty-three, I didn't have the complete clinical history. Therefore, I was lacking clinical backing of the clinical history to make a conclusive diagnosis. So my diagnosis was nonspecific. I use that term, which is nonspecific, about etiology. * * *

" * * *

"Q. Now we go, finally, to specimen 'E', which has also been identified as specimen five. Again, you use the term 'neuroma'. Is that because you have evidence of a lesion, but the etiology is nonspecific?

"A. Yes, sir, precisely."

While Dr. Martinez does not testify that plaintiff did not have a "tumor" on her seventh facial nerve, his testimony arguably reduces the value of his postoperative pathological report as evidence of the presence of a tumor on plaintiff's seventh facial nerve. Nonetheless, Dr. Martinez's testimony provides evidence that a pathology examination is severely limited in its ability to reveal the presence or absence of a nerve tumor based upon tissue slides alone; indeed, his testimony suggests that a clinical history such as Dr. May had access to is a necessary element to determining etiology.

Dr. Thaddeus Mandybur, a neuropathologist, also was called by defendant to testify that plaintiff did not have a "tumor" on her seventh facial nerve. Based upon his examination of the five tissue slides, Dr. Mandybur testified that no "tumor" tissue was evident in any of the slides, thus providing evidence that plaintiff did not have a "tumor" on her seventh facial nerve.

Finally, defendant called Dr. Bradley Welling, a neuro-otolaryngologist, to testify to the absence of a tumor on plaintiff's seventh facial nerve, based upon his review of plaintiff's medical records. Dr. Welling testified that none of the pathology reports contained in the record indicated the presence of a "schwannoma." However, Dr. Welling did not testify that no "tumor" existed, but only that a particular type of tumor, a schwannoma, was not present; thus, his testimony is of limited value.

While defendant presented some evidence that no tumor was present, the evidence is not overwhelming. Rather, defendant's evidence juxtaposed against Dr. Hunt's letter, Dr. May's postoperative report and Dr. Martinez's pathological report creates a genuine issue of fact which was properly for the jury to determine. The jury having resolved the conflict, we cannot say its resolution is against the manifest weight of the evidence. Thus, in granting defendant a new trial, the trial court in effect substituted its opinion for that of the jury. In so

doing, the court abused its discretion. Plaintiff's second assignment of error is sustained.

Our resolution of plaintiff's first and second assignments of error renders plaintiff's third, fourth and fifth assignments of error moot, and we do not reach the issues raised by those assignments of error. App.R. 12(A)(1)(c).

Having sustained plaintiff's first and second assignments of error, and having found plaintiff's remaining assignments of error to be moot, we reverse the judgment of the trial court and remand this cause to the trial court with instructions to reinstate the jury's verdict.

*Judgment reversed*
*and cause remanded*
*with instructions.*

BOWMAN and DESHLER, JJ., concur.