OPINION
{¶ 1} Amanda Heath, plaintiff-appellant, administrator of the estate of Stephanie Kramer, appeals from a judgment of the Franklin County Court of Common Pleas, in which the trial court granted directed verdict in favor of Steven Teich, M.D., and Children's Hospital ("Children's"), defendants-appellees.
 {¶ 2} Stephanie Kramer, who was four years old at the time of her death, suffered from an aggressive form of cancer. Appellant is Stephanie's mother. On March 26, 1996, Stephanie was admitted to Children's to undergo a heart catheter placement procedure to be performed by Dr. Teich, a pediatric surgeon at Children's. During placement of the catheter into Stephanie's heart by Dr. Teich, Stephanie's heart was punctured, causing blood to flow through her coronary sinus and into her pericardium. This situation is referred to as a hemopericardium. Stephanie went into cardiac arrest as a result of the accumulation of blood in her pericardium, which is referred to as pericardial tamponade or cardiac tamponade. Appellant claimed that Dr. Teich failed to diagnose and treat the pericardial tamponade with a procedure called pericardiocentesis. Stephanie was pronounced dead approximately 43 minutes later.
 {¶ 3} On July 25, 2000, appellant filed a complaint sounding in medical malpractice against Dr. Teich, Dr. Philip E. Vanik, and Children's. The complaint alleged medical malpractice for the wrongful death of Stephanie, lack of informed consent, and loss of society and companionship, and sought punitive damages. The claims for lack of informed consent and punitive damages were later disposed of via summary judgment, and Dr. Vanik is no longer a party to the action.
 {¶ 4} On October 3, 2002, appellant filed a motion to amend her complaint, which was denied by the trial court. On November 19, 2002, appellant filed another motion to amend her complaint, which the trial court granted. Appellant filed her amended complaint on March 20, 2003.
 {¶ 5} A jury trial commenced on September 8, 2003. At the close of appellant's case-in-chief, Dr. Teich and Children's moved for a directed verdict. The trial court granted the motion on October 7, 2003. Appellant appeals this judgment, asserting the following assignment of error:
The trial court erred in directing a verdict in favor of the defendants-appellees.
 {¶ 6} Appellant argues in her sole assignment of error that the trial court erred by granting appellees' motion for directed verdict. Pursuant to Civ.R. 50(A)(4), a motion for directed verdict should be granted if, after construing the evidence most strongly in favor of the party against whom the motion is directed, reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party. Goodyear Tire Rubber Co. v. Aetna Cas. Sur. Co.,95 Ohio St.3d 512, 2002-Ohio-2842, at ¶ 3. The trial court is only required to discern whether there exists any evidence of substantive probative value that favors the position of the non-moving party. Id.; Civ.R. 50(A)(4). The requisite question to ask is: Was there sufficient material evidence presented at trial on this issue to create a factual question for the jury? SeeMalone v. Courtyard by Marriott L.P. (1996), 74 Ohio St.3d 440. In determining whether to direct a verdict, the trial court does not engage in a weighing of the evidence, nor does it evaluate the credibility of witnesses. Ruta v. Breckenridge-Remy Co.
(1982), 69 Ohio St.2d 66, 67-68. Moreover, a motion for directed verdict presents a question of law and is reviewed by this court de novo. Goodyear Tire Rubber Co., supra, at ¶ 3.
 {¶ 7} Appellant maintains that she presented a prima facie case of both wrongful death and lost chance of survival via appellees' medical malpractice. Before addressing appellant's argument, we must address appellees' contention that appellant may not recover under a loss-of-chance claim because it was not separately pled in her complaint. Appellant counters that asserting a cause of action for wrongful death via medical malpractice was sufficient to assert a loss of chance of survival claim. Although we find no Ohio cases that have explicitly addressed this issue, in the landmark case recognizing the loss of chance doctrine, Roberts v. Ohio Permanente Med. Group, Inc.
(1996), 76 Ohio St.3d 483, the Ohio Supreme Court found that a loss of chance cause of action was viable in a case in which the plaintiff pled only wrongful death. See id. (Cook, J., dissenting) (noting that the only claim filed by the plaintiff in the case was for wrongful death). Further, courts in other states have specifically found that a claim for lost chance of survival need not be raised separately from a wrongful death or medical malpractice claim. See Mead v. Adrian (Iowa 2003),670 N.W.2d 174, 177, fn.3, citing Wendland v. Sparks (Iowa 1998),574 N.W.2d 327, 329 (Supreme Court of Iowa finding that a party need not plead a theory of lost chance of survival to avail himself of such claim in a wrongful death action based on medical malpractice); Powell v. St. John Hosp. (2000),241 Mich. App. 64, 76 (the lost chance of survival doctrine is not a separate theory of recovery from plaintiff's medical malpractice claim, and, therefore, plaintiff was not required to plead it). In accord with these decisions, we find appellant was not required to plead her loss-of-chance claim separately in her complaint.
 {¶ 8} We will address appellant's traditional malpractice claim first. To maintain a wrongful death action on a theory of negligence, a plaintiff must show three elements: (1) a duty owed to the plaintiff's decedent; (2) a breach of that duty; and (3) proximate causation between the breach of duty and the death.Littleton v. Good Samaritan Hospital Health Ctr. (1988),39 Ohio St.3d 86, 92, citing Bennison, Admx. v. Stillpass TransitCo. (1966), 5 Ohio St.2d 122, paragraph one of the syllabus. As it relates to a traditional medical malpractice claim, a party must demonstrate the existence of three basic elements to establish a claim for medical malpractice: (1) that there existed a duty on behalf of the physician-defendant to the plaintiff; (2) the standard of care recognized by the medical community; (3) the failure of the defendant to meet that standard of care; and (4) a proximate causal link between the breach of the standard of care and the injuries sustained. See Bruni v. Tatsumi (1976),46 Ohio St.2d 127, paragraph one of the syllabus. In relation to the second and third elements of the claim, the Ohio Supreme Court has held:
In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things.
Id.
 {¶ 9} In order to show that the actions of the physician fell below the standard of care and that this breach was the cause of the injuries, Bruni requires a plaintiff to present expert testimony. See id., at 130. Specifically, an expert witness must testify as to the applicable standard of care, the breach of that standard, and proximate cause. Expert testimony with respect to proximate cause must be stated in terms of probability. Stinsonv. England (1994), 69 Ohio St.3d 451, paragraph one of the syllabus. Expert testimony with respect to proximate cause must be based on probability because numerous causes, including, but not limited to, a physician's negligence, may have contributed to a plaintiff's injury. Toth v. Oberlin Clinic, Inc., Lorain App. No. 01CA007891, 2002-Ohio-2211, at ¶ 13. An opinion based on probability is necessary to express whether the injury was more likely than not caused by the physician's breach of the standard of care. Id. In other words, "probably" is defined as greater than a 50 percent chance. Miller v. Paulson (1994),97 Ohio App.3d 217, 222. The application of this traditional rule of causation is straightforward in malpractice cases in which the injured party's prognosis for recovery was better than 50 percent at the time of the alleged malpractice. See McDermott v. Tweel,151 Ohio App.3d 763, 2003-Ohio-885, at ¶ 40.
 {¶ 10} In the present case, the parties do not dispute that Dr. Teich owed appellant a duty. Thus, the first element was satisfied. With regard to the standard of care and breach of that standard of care elements, appellant's expert, Dr. Peter B. Manning, testified:
Q. * * * Do you have an opinion within a reasonable degree of medical certainty whether or not Dr. Teich's failure to ascertain and treat the cardiac tamponade complication and its resulting effects upon Stephanie, to include the hemopericardium and the resulting cardiac arrest, fell below the standard of care prevailing among physicians in Ohio?
A. Yes, I do.
* * *
Q. What is that opinion, sir?
A. My opinion is that in a situation like this, standard of care would be to recognize the most likely complications that — to suspect the most likely complications that could result in this and deal with them. So in this scenario, which we refer to as pulseless electrical activity, where there is an EKG tracing with no blood pressure, typically tension pneumothorax and pericardial tamponade are the two immediately treatable causes that should be suspected in such a case and should be at least ruled in or ruled out relatively early in the resuscitation.
* * *
Q. And do you have an opinion to within a reasonable degree of medical certainty whether or not Dr. Teich could have done that?
A. Certainly.
* * *
THE WITNESS: Yes, it could have been ascertained.
Dr. Manning further testified:
Q: Should Dr. Teich have attempted to ascertain and rule out a cardiac tamponade in this code?
* * *
A. I believe that somebody should have tried to rule out that as a possibility.
Q. Well, he was the physician performing the surgery. Should he have done that?
A. Yes.
Dr. Manning also testified:
Q. Is there any documentation in the records that Dr. Teich even considered the possibility of a cardiac tamponade in this situation?
A. I could not find anywhere in the record that anybody that was involved in the care considered tamponade as a possible cause of the instability.
Further, Dr. Manning testified:
Q. Now, there is no documentation in the record that he ascertained or attempted to treat the cardiac tamponade, correct?
A. That is true.
Q. Should he have done so?
A. I believe so.
 {¶ 11} Accordingly, Dr. Manning testified that the standard of care was to ascertain and treat the most likely complications that could have caused the pulseless activity, namely, tension pneumothorax and pericardial tamponade. Dr. Manning also testified that there was no evidence in the medical records that Dr. Teich considered or ruled out cardiac tamponade and that such would normally be included in the medical records and notes. Appellees argue that Dr. Teich's testimony that he did, in fact, consider and rule out cardiac tamponade disproved Dr. Manning's testimony and the medical records and affirmatively established that he did not fall below the standard of care. However, in the context of a motion for directed verdict, it is not for the trial court to determine credibility and weigh evidence. It was for the jury to determine Dr. Teich's credibility on this point. If we were to simply accept Dr. Teich's testimony as true, any defendant could be granted directed verdict by merely presenting self-serving testimony that contradicted the expert testimony and other evidence presented by the plaintiff in support of the applicable elements. Therefore, construing Dr. Manning's testimony and all the other evidence most strongly in favor of appellant, appellant presented sufficient material evidence of the standard of care and Dr. Teich's failure to meet such standard to create a factual question for the jury
 {¶ 12} The final element appellant had to demonstrate for her traditional medical malpractice claim was a causal link between Dr. Teich's failure to consider and treat the cardiac tamponade and Stephanie's death. In a traditional medical malpractice claim, such proximate cause must be established by a probability. Thus, appellant was required to demonstrate, with a reasonable degree of probability, that Dr. Teich's failure to consider and treat Stephanie's cardiac tamponade was the proximate cause of her death. On this point, Dr. Manning testified:
Q. Dr. Manning, do you have an opinion within a reasonable degree of medical certainty concerning whether or not the failure of Dr. Teich to ascertain and treat the cardiac tamponade condition in this case proximately led to the death of Stephanie Kramer?
* * *
A. Yes.
Q. What is that opinion, sir?
* * *
THE WITNESS: Okay. Based on the autopsy, the pathologist ruled that the child died of a tamponade, so failure to treat that tamponade resulted in the child's death.
Thus, Dr. Manning specifically testified that Dr. Teich's failure to ascertain and treat the cardiac tamponade condition proximately led to the death of Stephanie.
 {¶ 13} Appellees, however, counter that, on cross-examination, Dr. Manning's testimony was equivocal and he contradicted his direct-examination testimony. On cross-examination, Dr. Manning testified:
Q. And these [venous blood gas results] would indicate to you that if a pericardiocentesis was performed immediately after these values had been reported, it would be impossible to say whether this patient would have survived the code. Do you agree with that, Dr. Manning?
A. It is difficult to say one way or the other.
Q. It is impossible to say, isn't it, Dr. Manning?
A. Regardless of what the lab results are, it would be impossible to say what would have happened. I think — I don't have a crystal ball. I can't say exactly what would have happened if a pericardiocentesis had occurred.
Q. You just can't say?
A. I think there is a likelihood that the patient would have been able to be restored, a blood pressure restored at least initially.
Q. You can't say whether she would have survived that, can you, Dr. Manning?
A. I can't say 100 percent certain, no. I can say that the chances of her being able to be stabilized exist and should have been fairly high.
Appellees also point to the following testimony of Dr. Manning:
Q. And these blood gases indicate that this patient was very critical and resuscitation would have been very difficult. Do you agree with that?
A. I agree with the statement that the patient was very critical. It is difficult to assess how difficult the resuscitation would have been.
* * *
Q. You can't say how difficult this resuscitation would have been?
A. No. It is not possible to say.
Q. And it is impossible to say whether this patient would have survived resuscitative efforts even if pericardiocentesis would have been undertaken, is that fair to say, Dr. Manning?
A. It is impossible to be certain that the patient would have survived.
Q. It is impossible to say she would have survived?
A. With certainty, yes.
Q. With any reliability, it is impossible to say she would have survived?
A. I don't necessarily agree with that. We are sort of splitting hairs on probabilities and guesswork.
Q. Well, it is guessing to determine whether this patient would have been able to survive given her condition, given the very poor values that we received from the laboratory. It would just be guessing to say one way or another, would it not, Dr. Manning?
A. It might be guessing, and I think my guess would be that she would have had a good chance of being stabilized had a pericardiocentesis been performed earlier.
Q. If she had been stabilized, you can't say whether she would have survived, and you can't say whether she would have had an organ failure or other damage, is that fair to say?
A. Had she been stabilized, certainly there would have been a lot of challenges still yet to face.
Q. It would be impossible to say?
* * *
THE WITNESS: It is impossible to say with certainty what the outcome would have been.
Appellees contend this testimony demonstrated that, despite Dr. Manning's testimony on direct, he could not testify with any probability that Stephanie's death was a proximate result of Dr. Teich's failure to ascertain and treat the cardiac tamponade.
 {¶ 14} However, it has been held that:
* * * Once an expert properly states his professional opinion to a properly formed question as to "probability," he or she has established a prima facie case as a matter of law. Erosion of that opinion due to effective cross-examination does not negate that opinion; rather it only goes to weight and credibility. Thus, it would not usually be a suitable instance for application of a directed verdict. The exception would be when the expert actually recants the opinion on cross. * * *
Galletti v. Burns Internatl. (1991), 74 Ohio App.3d 680, 684
(Christley, P.J., concurring). Thus, the party moving for a directed verdict must show that the testimony was resolved in its favor by a direct contradiction, negation, or recantation of the testimony given by the witness on direct examination. Nichols v.Hanzel (1996), 110 Ohio App.3d 591, 602. If no such contradiction, negation, or recantation is shown, the testimony given on cross-examination only arouses speculation regarding the witness's testimony on direct and leaves a question of fact for the jury to determine. Id., citing Shapiro v. Burkons (1978),62 Ohio App.2d 73, 83-84. In other words, "[s]ubsequent recantations of certainty on cross-examination do not destroy the admissibility of the testimony, but act as impeachments of the expert's credibility." Galletti, supra, at 685-686 (Ford, J., concurring).
 {¶ 15} We agree that Dr. Manning's testimony on cross-examination raises some question as to his unequivocal opinion on direct examination that Dr. Teich's failure to ascertain and treat the cardiac tamponade proximately caused Stephanie's death. On direct examination, Dr. Manning was certain, within a reasonable degree of medical certainty, that failure to ascertain cardiac tamponade and perform a pericardiocentesis proximately caused Stephanie's death, but he later stated on cross-examination that he did not believe that it was possible to predict whether a pericardiocentesis would have prevented her death. Nevertheless, Dr. Manning maintained on redirect examination that none of the questions asked during cross-examination caused him to change the opinions he gave on direct examination. The cross-examination seemed to create a disconnection with defense counsel's cross-examination questions focusing on certainty and the doctor answering in probabilities. While cross-examination established that the doctor could not predict with certainty that her life could have been saved had the pericardial tamponade been diagnosed and treated, we do not find that the testimony of Dr. Manning was negated, directly contradicted, or recanted on cross-examination so as to eliminate the possibility that reasonable minds could reach different conclusions about the proximate cause of Stephanie's death. After construing the evidence in favor of appellant, we find there existed evidence of substantive probative value to create a factual question for the jury on appellant's traditional medical malpractice claim.
 {¶ 16} For these reasons, the trial court erred in granting directed verdict in favor of Dr. Teich on appellant's traditional medical malpractice claim. Insofar as the liability of Children's under an agency by estoppel theory is dependent upon Dr. Teich's liability, and the trial court granted directed verdict to Children's based solely on its finding that Dr. Teich was not liable, the trial court also erred in directing verdict in favor of Children's. Because we have found that directed verdict was wrongly granted to appellees on appellant's traditional medical malpractice claim, we must remand the matter for a new trial, whether appellant presented sufficient material evidence on the loss-of-chance claim during the previous trial to create a factual question for the jury is moot, and we need not address it. Therefore, appellant's assignment of error is sustained.
 {¶ 17} Accordingly, appellant's assignment of error is sustained, the judgment of the Franklin County Court of Common Pleas is reversed, and this matter is remanded to that court for proceedings consistent with this opinion.
Judgment reversed and cause remanded.
Bryant, J., concurs.
Sadler, J., concurs separately.