[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S MOTIONS TO SET ASIDE THE VERDICT, FOR REMITTITUR, FOR A NEW TRIAL AND FOR JUDGMENT NOTWITHSTANDING THE VERDICT
The plaintiff, Edward Cohen, brought this medical malpractice action against Yale New Haven Hospital; Yale University School of Medicine; Yale University School of Medicine, Office of Professional Services; Hunter Radiation Therapy Clinic; Dr. Barry Kacinski, M.D.; Yale Diagnostic Radiology; Dr. Lee D. Katz, M.D.; and Dr. Marc E. Newberg, M.D. The plaintiff alleged that the defendants were negligent in failing to diagnose a sarcoma in his left leg. Prior to trial, the plaintiff withdrew his action against all defendants except Dr. Kacinski (hereafter, the defendant). The case proceeded to trial before a jury which rendered a verdict in favor of the plaintiff for $2,000,000. The defendant has moved to set aside the verdict and for a new trial or judgment notwithstanding the verdict and for a remittitur. CT Page 10702
In considering the defendant's motions, the court is required to give the evidence the most favorable construction in support of the verdict.Meaney v. Connecticut Hospital Assn., Inc., 250 Conn. 500, 509,735 A.2d 813 (1999); Hanauer v. Coscia 157 Conn. 49, 53, 244 A.2d 611
(1968). The jury could reasonably have found the following facts.
At the time of trial, the plaintiff was forty four years old. In 1972, when he was a teenager, the plaintiff developed a soft tissue sarcoma, a malignant tumor, in his left thigh. The sarcoma was surgically removed and the plaintiff subsequently received radiation therapy. In 1978, a benign tumor was removed from the plaintiff's left leg, near the site of the scar tissue from the earlier surgery. Thereafter, the plaintiff received annual check-ups.
In 1986, the plaintiff came under the care of the defendant, an attending radiation therapist with the Hunter Radiation Therapy Clinic. The defendant was aware of the plaintiff's medical history. The plaintiff continued to receive periodic check-ups, bi-annually.
In 1992, the plaintiff began experiencing pain in his left leg and noticed a hard growth on the border of the scar left by his surgeries. He was examined by the defendant on September 17, 1992. The defendant referred him to Dr. Lee Katz for magnetic resonance imaging (MRI) of his left leg. Katz performed the MRI on September 21, 1992, and wrote a report to the defendant, stating: "[T]here are two small well defined areas. . . . There is no definite evidence of soft tissue sarcoma. . . . The two lesions vary somewhat in appearance . . . I believe these represent a nonaggressive finding and probably not a recurrence of the mesenchymal sarcoma, but one cannot be entirely sure. Follow-up within 6-8 weeks is recommended with cessation of physical activity. Alternatively, one could consider ultrasound for identification of possible aspiration and follow-up."
Within a few days of the MRI, the plaintiff spoke with the defendant. The defendant informed the plaintiff that he was fine but that he had a severe amount of scar tissue from his previous surgery and radiation.[1]
The defendant did not advise the plaintiff that there was a chance that the cancer had recurred and did not recommend that he undergo follow-up testing.
Except for two telephone conversations with the defendant's secretary regarding billing matters, the plaintiff had no further contact with the defendant or his staff until the Spring of 1993. On May 26, 1993, the plaintiff returned to the defendant complaining of increased pain in his left leg and bumps on the back of his left leg. The defendant referred the plaintiff for another MRI, which was performed on June 14, 1993. The CT Page 10703 MRI revealed a suspicious mass in the plaintiff's left leg. As a result of a needle biopsy the next day, the plaintiff was diagnosed as having a high grade malignancy.
The plaintiff then traveled to Boston, Massachusetts where he was treated by Dr. Samuel Singer. Dr. Singer started the plaintiff on a course of chemotherapy. At the end of July, 1993, when the chemotherapy was unsuccessful, Dr. Singer surgically removed a soft tissue sarcoma from the plaintiff's left leg. Dr. Singer prescribed a course of post-surgical brachytherapy.[2] After this surgery, the only activity the plaintiff was unable to perform was running. However, between 1993 and 1995, the function of the plaintiff's left leg deteriorated. First the plaintiff's toe, then his foot and finally his leg were becoming numb, and he started dragging his leg and falling down.
In 1995, the plaintiff complained that the pain was recurring in his leg. After further testing, Dr. Singer diagnosed the plaintiff as having a recurrence of the sarcoma. Dr. Singer again performed surgery and prescribed brachytherapy. The surgery removed more of the leg and part of the plaintiff's left buttock, leaving him further disfigured. The sarcoma recurred yet again in 1997 and again Dr. Singer surgically removed it.
The case was tried to a jury. Toward the end of the trial, the court suggested, and the parties agreed to, bifurcating the issues of breach of the standard of care, on the one hand, and causation and damages on the other. Also by agreement, the charge on breach of the standard of care was simplified, and the court charged as follows: "There are a lot of complex medical facts in this case. But the standard of care of a radiation oncologist in September, 1992, is not one of them. The parties agree that if Mr. Cohen's version of what the defendant said to him in September, 1992, after receiving the MRI report, is accurate, then the defendant breached the standard of care, and you would go on to the other issues in this case. If, however, you believe Dr. Kacinski's and Sue Augir's [Dr. Kacinski's secretary] version of what they said to the plaintiff in September, 1992, then the defendant did not breach the standard of care and you would return a defendant's verdict."
The jury found for the plaintiff on the issue of whether the defendant breached the standard of care. The case was then submitted to the jury on the issues of causation and damages. The jury, responding to special interrogatories, rendered a verdict for the plaintiff in the amount of $2,000,000. The defendant has filed motions to set aside the verdict and for a new trial or judgment notwithstanding the verdict, and for a remittitur. Additional facts will be discussed as necessary.
 I
CT Page 10704
The "standard of review for motions to direct a verdict, motions to set aside a verdict and motions for judgment notwithstanding the verdict are the same." (Internal quotation marks omitted.) Medcalf v. WashingtonHeights Condominium Assn., Inc., 57 Conn. App. 12, 15 n. 2, 747 A.2d 532
(2000). "The setting aside of a verdict can occur . . . for two general reasons. First, a trial court may set aside a verdict on a finding that the verdict is manifestly unjust because the jury, on the basis of the evidence presented, mistakenly applied a legal principle or because there is no evidence to which the legal principles of the case can be applied. . . . Second, a verdict may be set aside if its result justifies a suspicion that a juror or jurors were influenced by prejudice, corruption or partiality." (Citation omitted; emphasis in original.) Foley v.Huntington Co., 42 Conn. App. 712, 724-25, 682 A.2d 1026, cert. denied,239 Conn. 931, 683 A.2d 397 (1996)
"The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence. . . . The supervision which a judge has over the verdict is an essential part of the jury system. . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles, or as to justify the suspicion that they or some of them were influenced by prejudice, corruption or partiality. . . . The court has a duty to set aside the verdict where the jury's action is so unreasonable as to suggest that it was the product of such improper influences . . . A verdict may be set aside even if the evidence was conflicting and there was direct evidence in favor of the party who prevailed with the jury. . . .
"The decision to set aside a verdict entails the exercise of a broad legal discretion that, in the absence of clear abuse, we shall not disturb. . . . [T]he trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence. . . . Moreover, the trial judge can gauge the tenor of the trial . . . and can detect those factors, if any, that could improperly have influenced the jury . . .
"Litigants, however, have a constitutional right to have issues of fact determined by a jury. . . . The right to a jury trial is fundamental in our judicial system, and . . . the right is one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference CT Page 10705 of opinion among fair-minded men passed upon by the jury and not by the court. (Citations omitted; internal quotation marks omitted.) Palomba v.Gray, 208 Conn. 21, 23-25, 543 A.2d 1331 (1988)
Preliminarily, it must be understood that the case that was submitted to the jury on damages was very different from the case that the plaintiff came to court to try. At trial, the principal claim of damages advanced by the plaintiff was that the defendant was negligent in not referring him for further diagnostic testing after the September, 1992 MRI, and that this negligence caused his sarcoma to grow in size and to progress from low grade to high grade which, in turn, caused the recurrence of the tumor in 1995 and 1997. Further, the plaintiff claimed that the defendant's negligence caused the ravaging effects on his leg that resulted from the surgeries in 1995 and 1997 and the therapies incident to those surgeries.
As the plaintiff's case came to a close, it was clear that there was no evidence to support submitting that claim of damages to the jury. The plaintiff argued that the claim was supported by the testimony of Dr. Singer. Dr. Singer testified that, because of the one millimeter margin (i.e., proximity) of the plaintiff's tumor to the sciatic nerve in July, 1993, there would have been a 70 percent to 80 percent chance that the tumor would have recurred after the 1993 surgery had the plaintiff not had brachytherapy. However, the plaintiff did have brachytherapy, prescribed by Singer himself.
The plaintiff's reliance on Singer's estimate of a 70 percent to 80 percent recurrence rate is untenable because it is based on a fact that Singer himself testified, and both parties agree, does not exist — the plaintiff's not having brachytherapy. "A trier of fact, whether court or jury, may accept part of the testimony of any witness although it rejects the rest. It cannot, however, cull statements from the testimony of an expert which in and of themselves are not complete but are dependent upon other testimony." Snyder v. Pantaleo, 143 Conn. 290, 295,122 A.2d 21 (1956).
The plaintiff's fall-back position was based on Singer's testimony that with the brachytherapy, the chance of the plaintiff's tumor recurring was 30 percent. The plaintiff argued that this was probative evidence of causation under Petriello v. Kalman, 215 Conn. 377, 576 A.2d 474 (1990). In Petriello v. Kalman, the Supreme Court held that "in a tort action, a plaintiff who has established a breach of duty that was a substantial factor in causing a present injury which has resulted in an increased risk of future harm is entitled to compensation to the extent that the future harm is likely to occur," even if that risk is less than 51 percent. (Emphasis added.) Id., 397-98.[3] This was a departure from the CT Page 10706 general rule that damages in a tort action must be based on reasonable probabilities. Marchetti v. Ramirez, 240 Conn. 49, 54, 688 A.2d 1325
(1997); Brennan v. Burger King Corporation, 46 Conn. App. 76, 79-80,698 A.2d 364 (1997), aff'd, 244 Conn. 204, 707 A.2d 30 (1998). The exception carved out by the court in Petriello v. Kalman was based on the fact that our tort system does not provide a second opportunity to revise damages with the benefit of hindsight; Petriello v. Kalman, supra,215 Conn. 395; and the proposition that it is the present risk, rather than the future event, that is compensable. Id., 396.
Here, in contrast, the plaintiff's principal claim was not for the present risk of future harm, but for past events — the local recurrences of his tumor in 1995 and 1997. The holding of Petriello v.Kalman and its underlying rationale are not applicable.
"In a medical malpractice action, the plaintiff must present medical expert testimony to establish that the defendant['s] treatment and care fell short of [i.e., breached] the required standard [of care] and that the breach proximately caused the plaintiff's injuries." (Internal quotation marks omitted.) Vinchiarello v. Kathuria, 18 Conn. App. 377,381, 558 A.2d 262 (1989). "To prevail on a negligence claim, a plaintiff must establish that the defendant's conduct legally caused the injuries. . . . [L]egal cause is a hybrid construct . . . . The first component of legal cause is causation in fact. . . . The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct. . . . The second component of legal cause is proximate cause, which [the Connecticut Supreme Court has] defined as [am actual cause that is a substantial factor in the resulting harm. . . ." (Citations omitted; internal quotation marks omitted.) Paige v. St. Andrew's RomanCatholic Church Corp., 250 Conn. 14, 24-25, 734 A.2d 85 (1999). Thus, for negligence to be a legal cause of an injury, both components must exist, cause in fact and proximate cause. Id. 24.
Even when considered with other evidence in the case, Dr. Singer's opinion that, due to the proximity of the plaintiff's tumor to his sciatic nerve in July, 1993, there was a 30 percent chance that the plaintiff's tumor would recur following the administration of brachytherapy, did not establish that the defendant's negligence was a cause in fact of the 1995 or 1997 recurrences. Absent such evidence, under the law of Connecticut, the court has no basis for allowing the jury to consider such a claim. Cf. Grody v. Tulin, 170 Conn. 443, 450-51, 365 A.2d 1076 (1976) ; Batesv. Carroll, 99 Conn. 677, 678-79, 122 A. 562 (1923). "The court has a duty to submit to the jury no issue upon which the evidence would not reasonably support a finding." Batick v. Seymour, 186 Conn. 632, 641,443 A.2d 471 (1982) ; accord Blanchette v. Barrett, 229 Conn. 256, 284,640 A.2d 74 (1994). CT Page 10707
The plaintiff's principal claim, therefore, was limited to a claim for "lost chance" for a better result. "To prevail on this claim, a plaintiff must show (1) that he has in fact been deprived of a chance for successful treatment and (2) that the decreased chance for successful treatment more likely than not resulted from the defendant's negligence." (Internal quotation marks omitted.) Wallace v. St. Francis Hospital Medical Center, 44 Conn. App. 257, 262, 688 A.2d 352 (1997) "`In other words, the plaintiff must show that what was done or failed to be done probably would have affected the outcome.' . . . LaBieniec v. Baker,11 Conn. App. 199, 207, 526 A.2d 1341 (1987)" (Citation omitted.) Id.,
263; see also Borkowski v. Sacheti, 43 Conn. App. 294, 310, 682 A.2d 1095, cert. denied, 239 Conn. 945, 686 A.2d 120 (1996). The plaintiff adduced no evidence that he had a "better than even chance" for not developing a sarcoma in the future. Wallace v. St. Francis Hospital Medical Center,
supra, 44 Conn. App. 264. Therefore, he was not entitled to have this claim submitted to the jury. Id.
In light of this failure of proof, the court scoured the record for items of damages, on which to charge the jury, that were arguably supported by evidence and within the ambit of the broad claims of damages alleged in the complaint, on which to charge the jury. The court identified, and the plaintiff concurred,[4] that there were three such items: (1) the plaintiff's illness from chemotherapy in July, 1993, (2) the impaired functioning of the plaintiff's leg between 1993 and 1997, which resulted from damage to the sciatic nerve, which, in turn, was caused in substantial part by the brachytherapy in July, 1993, and (3) the increase in the plaintiff's risk of dying over the ensuing three and one-half years. The jury found that the first of these items of damages had not been proved but.that the second and third were proved.
 II
The defendant claims that the plaintiff failed to prove that the defendant's negligence caused the plaintiff any harm. Specifically, the defendant claims that the plaintiff failed to prove that the subsequent testing, to which the defendant allegedly failed to refer the plaintiff, would have resulted in a positive diagnosis of cancer. The plaintiff does not dispute that, as a necessary link in the chain of causation, it was his burden to prove that such testing, if conducted six to eight weeks after his September 21, 1992 MRI, would have disclosed his sarcoma. SeeGrody v. Pulin, supra, 170 Conn. 451; Shapiro v. Burkons, 62 Ohio App. 73, 16 Ohio Op.3d 175, 404 N.E.2d 778 (1978).
The following colloquy occurred between the plaintiff's attorney and Dr. James Vogel, a medical oncologist: CT Page 10708
 Q: Is it fair to say that the earliest that there would have been diagnosis and treatment would have been some six to eight weeks after September 21, 1992?
A: I think that's fair.
The defendant argues that "Dr. Vogel's statement that it was `fair' to say that the earliest time there would have been diagnosis was six to eight weeks after September 21, 1992 did not suffice to prove that it was reasonably probable that a positive diagnosis would have been made in December 1992." (Emphasis in original.) The plaintiff responds that the court is bound to view the evidence in a light most favorable to sustaining the verdict.
Especially because Vogel was merely signaling his agreement to a leading question, his answer must be examined in the context of that question; Sofas v. McKee, 100 Conn. 541, 549, 124 A. 380 (1924); and both must be examined "by looking at the entire substance of the expert's testimony"; Struckman v. Burns, 205 Conn. 542, 555, 534 A.2d 888 (1987); that is, in context. Nolan v. Borkowski, 206 Conn. 495, 507, 538 A.2d 1031
(1988); Acampora v. Asselin, 179 Conn. 425, 427, 426 A.2d 797 (1980);O'Reilly v. General Dynamics Corp., 52 Conn. App. 813, 817-18, 728 A.2d 527
(1999).
"Expert opinions must be based upon reasonable probabilities rather than mere speculation or conjecture if they are to be admissible in establishing causation. . . . To be reasonably probable, a conclusion must be more likely than not . . . Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend upon the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony." Struckman v. Burns, supra,205 Conn. 554-55. "As long as it is clear that the opinion of the expert is expressed in terms of probabilities, the opinion should be submitted into evidence for a jury's consideration." Id., 555.
Viewed in the context of his entire testimony, and in a light most favorable to sustaining the verdict, Vogel's testimony may be reasonably construed as stating that the plaintiff's sarcoma probably would have been diagnosed six to eight weeks after his September 21, 1992 MRI, when the defendant should have told him to return for follow-up testing. In questioning Dr. Vogel, the plaintiff's attorney used the words "would have been." One definition of the word "would" provides that it may be "used in auxiliary function to express probability or presumption in past or present time." Merriam Webster's Collegiate Dictionary (10th Ed. CT Page 10709 1991). That the dictionary employs other definitions of the word "would" which may be less favorable to the plaintiff is not dispositive. In ruling on a motion to set aside the verdict, "we must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial. . . ." (Internal quotation marks omitted.) Ham v. Green, 248 Conn. 508,519, 729 A.2d 740, cert. denied, ___ U.S. ___, 120 S.Ct. 326,145 L.Ed.2d 254
(1999). So too, Vogel's answer of "I think that's fair" is not fatal. "Fair" has been defined as-"likely." Merriam Webster's Collegiate Dictionary, supra. Talismanic or formulaic words "are not essential when an expert renders an opinion as long as it is clear that the opinion of the expert is expressed in terms of probabilities." Shegog v. Zabrecky,36 Conn. App. 737, 746, 654 A.2d 771, cert. denied, 232 Conn. 922,656 A.2d 670 (1995) Therefore, there was sufficient evidence from which the jury could have found that if the defendant had referred the plaintiff for testing six to eight weeks after his initial MRI, that testing would have disclosed the existence of a sarcoma.
 III A.
The defendant contends that the verdict should be set aside because there was no evidence that the defendant's breach of duty caused him to undergo brachytherapy in 1993. The gravamen of the defendant's argument is the testimony of the plaintiff's surgeon, Dr. Samuel Singer, that given the margin between the plaintiff's tumor and his sciatic nerve in December, 1992, had surgery been performed at that time, it would have been within the standard of care either to administer or not administer such therapy following surgery. Such testimony, standing alone, is not sufficient to establish causation. See Aspiazu v. Orgera, 205 Conn. 623,632, 535 A.2d 338 (1987) ("fifty-fifty chance" cannot support award of damages for physical injury); Wallace v. St. Francis Hospital MedicalCenter, supra, 44 Conn. App. 264.
The plaintiff posed a hypothetical question to Dr. Singer and asked him, "what would you have done" in December, 1992. (Emphasis added.) Dr. Singer answered as follows, and the ensuing colloquy occurred:
 we probably could have treated him [the plaintiff] without the Brachy therapy and just used surgery in and of itself if we had enough — if we had that normal margin around it, we wouldn't need to use the Brachy therapy. . . . So he would just have been treated with surgery, a good surgical resection. The surgical resection would be similar, but he wouldn't CT Page 10710 need the Brachy therapy [sic]. . . .
 Q: And he wouldn't have needed the Brachy therapy because of the margin?
 A: The margin would be sufficient, the centimeter margin would be sufficient to rely on surgery in and of itself.
 I'm saying if in December it would still in my opinion would have been under five centimeters in size in terms of the aggregate volume and it would have been sufficiently away from the [sciatic] nerve that it would allow us to do surgery alone without the need for chemotherapy or radiation . . . .
 Q: Doctor, following the standard of care for surgical oncologists as it existed in December, 1992 and assuming that the sciatic nerve and closest point of the sarcoma were one centimeter apart, what would the standard have called for in terms off treatment?
 A: We would have treated this patient with a wide resection, the surgical resection alone, no chemotherapy and no radiation. . . .
 Q: Okay. And the only difference in the [1993] surgery being what?
 A: That we wouldn't need to do the Brachy therapy because we would have had a one centimeter margin there. . . .
(Emphasis added.)
The issue was whether the defendant's negligence was the proximate cause of the plaintiff's receiving brachytherapy in 1993 and of any resulting damage caused by that procedure. Thus the plaintiff was required to prove, in the first instance, that the defendant's negligence was a substantial factor in causing him to undergo brachytherapy in 1993. Tn turn, the plaintiff was required to prove that he probably would not have received brachytherapy had he been diagnosed and operated on in December, 1992. The defendant asserts that the plaintiff did not introduce expert medical evidence to prove these matters. It is true, as the defendant stresses, that initially, Dr. Singer was asked "what would you have done" (emphasis added) with respect to prescribing brachytherapy in December, 1992, and that he answered in terms of "we." Contrary to the defendant's argument, however, because Singer, in fact, was the surgeon CT Page 10711 who operated on the plaintiff to remove the tumor in July, 1993, his opinion as to what he would have done was, indeed probative. The defendant's claim that the plaintiff only sought Singer's services because he was upset with the defendant is not referable to any evidence and, at best, goes to the weight of Singer's testimony.
Moreover, Singer was subsequently asked "what would the standard [of care] have called for in terms of treatment?" Although Singer again answered this question with "we," the use of that word does not render his opinion irrelevant. First, as observed supra, no talismanic or "formulaic words are essential when an expert renders an opinion."Struckman v. Burns, supra, 205 Conn. 555; see also Vickers v. Jessup,32 Conn. App. 360, 363-64, 629 A.2d 457, cert. granted, 227 Conn. 922,652 A.2d 701 (1993); Sokolowski v. Medi Mart, Inc., 24 Conn. App. 276,285, 587 A.2d 1056 (1991). Second, it is noteworthy that the defendant did not object or move to strike the answer as unresponsive. "Consequently, the testimony became part of the evidence and was properly considered by the factfinder." In re Jose M., 30 Conn. App. 381, 390,620 A.2d 804, cert. denied, 225 Conn. 921, 625 A.2d 821 (1993). Third, "we" simply is defined as "I and the rest of the group that includes me. . . ." Webster's Ninth New Collegiate Dictionary (1991). The parties did not explore whether Singer, in using the word "we," meant only his surgical group or meant his profession. Although Singer conceded on cross examination that the use of brachytherapy in December, 1992, would also have been within the standard of care, viewing the evidence in a light most favorable to sustaining the verdict, the jury could have found that while the administration of brachytherapy in December, 1992, would not have been malpractice, neither would it probably have been necessary.
 B.
The defendant also suggests that there was insufficient evidence of proximate cause between the defendant's negligence and the plaintiff's receiving brachytherapy in 1993 because the plaintiff did not testify that, if he had been given an option in December, 1992, he would have opted not to undergo brachytherapy. The court disagrees.
This aspect of the causative link between the medical negligence and damages is analogous to that which arises in a cause of action based on a physician's failure to obtain informed consent from and to advise a patient of feasible alternatives prior to treatment. See e.g., Logan v.Greenwich Hospital Assn., 191 Conn. 282, 465 A.2d 294 (1983). In the latter context, Connecticut has adopted an objective standard for determining this component of proximate cause. "Under the objective standard . . . the question of causality is resolved in terms of what a prudent person in the patient's position would have decided if suitably CT Page 10712 informed of all perils bearing significance." (Citations omitted; internal quotation marks omitted.) Hammer v. Mount Sinai Hospital,25 Conn. App. 702, 711, 596 A.2d 1318, cert. denied, 220 Conn. 933,599 A.2d 384 (1991). Under this standard, the plaintiff's testimony as to what treatment or procedure he would have elected, if any, was not necessary. Id., 711-13.[5]
 C.
The defendant also argues that there was no evidence that the brachytherapy treatment in July, 1993, injured the plaintiff's sciatic nerve.
The plaintiff's claim for injury to his sciatic nerve necessarily terminated at the time of his surgery in 1997, when that nerve had to be removed for reasons unrelated to the defendant's negligence. Thus, the injury which the brachytherapy caused must have occurred, if at all, between 1993 and 1997. The gist of the defendant's argument is that there was insufficient evidence for the jury to determine whether the deterioration in the function of the plaintiff's left leg after 1993 was caused by the 1972 radiation, the 1993 brachytherapy, the 1995 brachytherapy or the muscle removed from the plaintiff's leg in the 1993 and 1995 surgeries. Specifically, the defendant asserts that there was no direct expert testimony that the 1993 brachytherapy caused any of the plaintiff's problems, and that the other factors could have caused the plaintiff's post-1995 problems. The court disagrees. With respect to the latter, the defendant refers to testimony of Dr. Singer in which he stated, in apparent reference to the 1993 surgery: "because we had to resect[,] his [plaintiff's] function is a lot worse."
Dr. Singer also testified:
 Q: And do you get any damage to sciatic nerve when you get as close to the sciatic nerve as we've talked about in either the surgery you did in July [1993] or the surgery . . . you would have done in December?
 A: Well, with surgery sometimes you can get just from dissecting the nerve, you can get a temporary pins and needles and numbness that just from the surgical dissection which often gets better. I think what really compounded that injury though — that temporary injury and made it permanent was the Brachy therapy and also his prior radiation that he had had. So the combination of the prior radiation when he was younger combined with the Brachy therapy is now the CT Page 10713 new treatment of Brachy therapy is what lead to the decramen [sic] of sciatic nerve function.
Dr. Singer further testified:
 The sciatic nerve runs down the back of the thigh and it goes all the way down and goes into two branches, but it basically controls sensation to the bottom of your foot. If you lose — if you lose the sciatic nerve function, you can't feel anything on the bottom of your foot. So if you step on glass, you wouldn't feel it basically. it also controls motor function in the ankle joint of the foot. So if you lose the sciatic nerver [sic], what happens is that the foot, you can't hold it up so the toes drop down. You get what's called a drop foot. And if you try and walk with a drop foot you'll stub your toes and fall down. So what you — if you take the sciatic nerve or if its injured to correct that you have to wear a brace to correct that so that you can walk without stubbing your toe.
(Emphasis added.)
The plaintiff testified:
 Q: And, functionally, how were you doing before the "95 surgery versus after the "95 surgery?
 A: I was deteriorating. After my "93 surgery I had a — some numbness in my big toe. And by "95, that numbness had spread throughout the foot and was going up my leg as well. In addition, I had problems with my leg. I was falling. I was dragging my leg. I was grate — grateful to be alive, grateful to be alive, but it was — it was challenging. It's tough. (Emphasis added.)
 Q: What kind of things couldn't you do after the "95 surgery or couldn't do as well or as often that you could do after the "93 surgery but before the "95 surgery?
 A: I had to have bars installed in my shower because my foot no longer had the strength to place — I couldn't stand in a shower without having a bar to CT Page 10714 hold on to. I was very subjected to fall. I was having a lot of problems in the wintertime with ice, terrible time with ice. I couldn't walk on ice. I fell a lot when I had to walk on ice. In terms of activity, the sports that I had enjoyed after "93 pretty much went out. I couldn't even go swimming.
"[T]he medical effect upon the human system of the infliction of injuries, is generally not within the sphere of the common knowledge of a lay witness. . . . The expert testimony can be presented in a number of ways: by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based on a hypothetical question. . . . Although useful, expert testimony is not always mandatory if the medical condition is obvious or common in everyday life. . . . This is especially true if one is testifying about his own physical condition. . . . Expert testimony may also not be necessary to establish causation if the plaintiff's evidence creates a probability so strong that a jury can form a reasonable belief without the aid of any expert opinion. . . ." (Citation omitted; internal quotation marks omitted.) Aspiazu v. Orgera, supra, 205 Conn. 631. Moreover, "[w]here the plaintiff has introduced evidence which removes the issue of proximate cause from the realm of mere speculation, that issue presents a question of fact for the trier. . . . The plaintiff is not required to show only one possible theory of causation, negating all others. . . . As was done in this case, a plaintiff may rely on circumstantial evidence and expert testimony to prove causation." (Citations omitted; internal quotation marks omitted.) Slepaki v.Williams Ford, Inc., 170 Conn. 18, 22, 364 A.2d 175 (1975); see alsoShelnitz v. Greenberg, 200 Conn. 58, 66, 509 A.2d 1023 (1986) ; Pisel v.Stamford Hospital, 180 Conn. 314, 340-41, 430 A.2d 1 (1980); Shegog v.Zabrecky, supra, 36 Conn. App. 746-47.
While Singer did not expressly testify that the 1993 brachytherapy caused the plaintiff particular symptoms, he did testify that "the combination of the prior radiation when he was younger combined with the brachytherapy is now the new treatment of brachytherapy is what lead to the decramen [sic] of sciatic nerve function." With respect to any claim that the plaintiff's post-1993 difficulty with his foot and leg might be ascribed to the 1972 radiation, "[t]here is no question that the defendant took the plaintiff as he found h[im] . . . and that he would be liable to the plaintiff for the effect of the injuries caused by him even though their effect might be more serious than in the case of a normal person." (Citation omitted; internal quotation marks omitted.) Bruneau v.Quick, 187 Conn. 617, 633, 447 A.2d 742 (1982). Notably, there was evidence that prior to his 1993 surgery, the plaintiff had been an active and athletic man for nearly two decades, without any impairment of the CT Page 10715 function to his left leg. Therefore, to the extent that the deterioration to the plaintiff's sciatic nerve by the 1993 brachytherapy caused damage to the function of his left foot and leg, the plaintiff is entitled to compensation for that damage. Tuite v. Stop and Shop Companies, Inc.,45 Conn. App. 305, 310-11, 310 n. 2, 696 A.2d 363 (1997).
As for the question of what specific damage the 1993 brachytherapy proximately caused the plaintiff, the jury certainly could have found, from Singer's explanation of the symptoms that follow damage to or destruction of the sciatic nerve, and from the plaintiff's testimony as to the symptoms from which he suffered prior to the 1995 surgery that, as a result of the 1993 brachytherapy, the plaintiff had numbness in his big toe that spread through his foot and caused him to drag his foot and resulted in his falling down. Moreover, based on the testimony of the plaintiff and Dr. Singer, the jury could reasonably have found that the 1993 brachytherapy was a substantial factor in causing the plaintiff's continuing problems in walking and standing, due to the loss of sensation in his foot after 1995 until his 1997 surgery.
 IV
The defendant argues that the plaintiff failed to prove by medical expert testimony that he has an increased risk of mortality. Based on the holding in Petriello v. Kalman, supra, 215 Conn. 397-98, the court charged the jury that it could award the damages to the plaintiff for the percentage increased risk that plaintiff would die because of the delay in treatment caused by the defendant's negligence.
The defendant claims that there was no evidence of any percentage increased risk that the defendant would die. The plaintiff responds that, based on the testimony of Dr. James Vogel, a medical oncologist, the jury could have reasonably found that the plaintiff has an increased risk of dying of cancer for the five year period July, 1998, to July, 2003. At the time of trial, approximately three and one-half years remained in that period.
Dr. Vogel testified that the plaintiff's tumor grew from less than five centimeters in diameter in December, 1992, to greater than five centimeters in diameter in June or July of 1993. As a result, Dr. Vogel opined, the plaintiff has an increased risk of mortality. According to Dr. Vogel because of the delay in the removal of the tumor, and in light of the fact that the plaintiff did not suffer a metastasy in the five year period after the cancer was removed in July, 1993, he has a 9 percent increased risk of dying from the disease for the ensuing five year period, July, 1998 to July, 2003. The following colloquy occurred between the plaintiff's attorney and Dr. Vogel. CT Page 10716
 Q: Doctor, I think when we broke, I was asking you if you could provide us with a statistic as to the increase mortality of Mr. Cohen as a result of the delay from December — December of 1992 to July of 1993?
A: Yes.
Q: And what is that statistic?
 A: The statistic is that if one lives over five years without any recurrence or distant recurrence, you have about a 9 percent risk for the subsequent five years.
 Q: For the subsequent five years, meaning the next five years.
 A: Yes, over the next five year period and, well, after ten years there probably is a very minimal risk. But, it's hard to quantitate.
. . . .
THE COURT: What is distant recurrence?
A: Metastasis.
On cross-examination, Dr. Vogel admitted that he based the 9 percent figure on a particular study (the Brennan study).[6]
 Q: And you said, based upon a study, that has increased risk of mortality because of the difference in size of that tumor, his increased rate was 9 percent, is that correct?
A: That's correct.
Q: And you referred to an article, right?
A: Yes.
The abstract of the study was admitted into evidence. it does not state, suggest or reflect that people who have a cancer or sarcoma that is larger than five centimeters have a certain percentage increased risk of mortality. Rather, the study concludes that people — all people — who had primary extremity sarcoma and who are metastasis free for CT Page 10717 five years have a 9 percent risk of dying of the disease within five years, in effect, regardless of the size of the primary sarcoma.
Vogel conceded that the study did not distinguish as to the size of the sarcoma. He then stated: "Well, the question that was put to me was is not that 9 percent the figure. And — And the answer — And because it reflected both the small and the large. And my — my contention is that, if anything, if you include the small tumors, it would drive the statistics higher, they would be into 15 percent or 20 percent. If you're taken all — all comers the statistics would be lower." (Emphasis added.) The plaintiff did not attempt to unscramble this testimony. However one reads Vogel's remarks, they do not support a finding, to a reasonable medical probability, of the extent to which the plaintiff's increase in mortality should be attributed to the increase in the size of has sarcoma from December, 1992, and July, 1993 — that is, beyond what any other victim of extremity sarcoma has.
On redirect examination, Dr. Vogel was asked: "[W]hy you gave the opinion you did, that is that Mr. Cohen's mortality was effected by the delay in diagnosis because the tumor grew from less than five centimeters to more than five centimeters." Dr. Vogel replied:
 Okay. A tumor less than five centimeters would have a small chance — much smaller chance of recurring. So, therefore, if you take all comers and you put all comers in this article and you — and you take everybody, less than five, more than five, and you get a rate of recurrence, you would — I mean, survival, I'm sorry, you get a 9 percent survival rate. The — The group that you're putting in that's less than five centimeters, if anything, would do better. So that if — if you were to take everybody and put everybody and make everybody over five centimeters, you would imagine that the recurrence rate would go higher. . . . I don't mean recurrence rate. I'm sorry, mortality rate. . . .
 Q: So, what would be there effect if they were looking only at people with cent — tumors greater than five centimeters?
A: I would imagine that it would be higher than 9 percent.
Q: Because? CT Page 10718
 A: Because your — your chance of — of getting a distant recurrence, which translates into a — which is a metastasis, which translates into death, would be hi — would be higher, greater, if your tumor is greater than five centimeters.[7]
Under Petriello v. Kalman, supra, 215 Conn. 375-76, to obtain a charge for increased chance of future harm, there must be evidence from which the jury can at least estimate the increase in the chance of future harm. Without such evidence, the jury can only speculate as to what that increased chance may be. Here there is no such evidence.
Generally, "[i]n order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion. . . . [E]xpert opinions must be based on reasonable probabilities rather than mere speculation or conjecture if they are to be admissible . . . . To be reasonably probable, a conclusion must be more likely than not." (Citations omitted; internal quotation marks omitted.) Card v. State,57 Conn. App. 134, 138-39, 747 A.2d 32 (2000)
Connecticut courts look to the entire substance of the expert's testimony in determining whether the expert has given a reasonable estimate or only speculation. Struckman v. Burns, 205 Conn. 542, 555,534 A.2d 888 (1987). "Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend upon the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony." Id. Thus even when a medical expert testifies that his opinion is based on a reasonable medical certainty, the court "must look at the entire substance of his testimony." (Internal quotation marks omitted.) Card v. State, supra, 57 Conn. App. 140. If, upon examination, the court determines that the expert's opinion is based on speculation, it "should not have been heard by the jury — at least not by way of witness testimony." Id.
In Petriello v. Kalman, supra, 215 Conn. 396-97, the court explained: "[T]he Second Restatement of the Law of Torts states, in § 912, that `[o]ne to whom another has tortiously caused harm is entitled to compensatory damages for the harm if, but only if, he establishes by proof the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit. "Damages for the future consequences of an injury can never be forecast with certainty. With respect to awards for permanent injuries, actuarial tables of average life expectancy are commonly used to assist the trier in measuring the loss a plaintiff is likely to sustain from the future effects of an injury. Such statistical CT Page 10719 evidence does, of course satisfy the more likely than not standard as to the duration of a permanent injury. Similar evidence, based upon medical statistics of the average incidence of a particular future consequence from an injury, such as that produced by the plaintiff in this case, may be said to establish with the same degree of certitude the likelihood of the occurrence of the future harm to which a tort victim is exposed as a result of a present injury. Such evidence provides an adequate basis for measuring damages for the risk to which the victim has been exposed because of a wrongful act." (Emphasis added; footnote omitted.) Id.,
396-97. Although this language suggests that a plaintiff is not necessarily required to fix a numerical percentage to the chance of future harm, the plaintiff must prove the extent of the risk of future harm. Indeed, in Petriello v. Kalman, the court held that "a plaintiff who has established breach of duty that was a substantial factor in causing a present injury which has resulted in an increased risk of future harm is entitled to compensation to the extent that the futureharm is likely to occur." (Emphasis added.) Id. 397-98; see also WillowSprings Condominium Assn., Inc. v. Seventh BRT Development Corp.,245 Conn. 1, 65, 717 A.2d 77 (1998) (plaintiff has burden of proving extent of damages suffered. Plaintiff need not provide proof with mathematical exactitude, but must provide sufficient evidence for trier to make fair, reasonable estimate)
Here, Vogel testified that the plaintiff had a 9 percent increased risk of dying because his sarcoma grew to more than five centimeters because of the delay in removing it. This figure, however, was based solely on a study which, as Vogel himself conceded, did not support his testimony. Dr. Vogel could and did opine from his own experience that the plaintiff had an increased chance of dying from cancer. However, examining the entire substance of his testimony in context, it is apparent that he was unable to quantify that increase to a reasonable medical probability. Thus the plaintiff failed to satisfy a requirement for recovery for increased risk of future harm under Petriello v. Kalman, supra,215 Conn. 396-98. Because the plaintiff was unable to quantify in any way "the extent that the future harm is likely to occur," the jury's award for the increased risk of future mortality cannot be sustained.
 V
The defendant claims that the court erred in overruling his motion in limine in which he sought to prevent Dr. Vogel from testifying at trial as to the plaintiff's future chance of dying from cancer. The defendant deposed Dr. Vogel on March 4, 2000. In his deposition Dr. Vogel testified that he did not know what the statistics were for survival beyond five years. He added, however: "I'll try to research and try to find them." Given the court's determination that the evidence was indeed insufficient CT Page 10720 to sustain a jury finding as to increased chance of mortality, this claim of error is moot.
However, even if it is determined that the court is mistaken in the conclusion it reached in part IV, supra, the court did not abuse its discretion in overruling the defendant's motion in limine. Whether Dr. Vogel could render an opinion was an evidentiary question. "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [E]videntiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Citation omitted; internal quotation marks omitted.) Gaudio v. Griffin Health Services Corp.,249 Conn. 523, 547, 733 A.2d 197 (1999) Witnesses are known to change their testimony at trial from that to which they testified in a deposition. Esposito v. Wethered, 4 Conn. App. 641, 645, 496 A.2d 222
(1985). Here, at his deposition, Dr. Vogel notified the defendant that he would be doing further research on the matter. Moreover, when the defendant learned that Dr. Vogel would be changing his deposition testimony, the defendant did not move for a continuance. The remedy for a change in testimony which results in the late disclosure of evidence is not to forbid the change in testimony, but to afford the disadvantaged party a continuance and fair chance for cross-examination. Rullo v.General Motors Corp., 208 Conn. 74, 79, 543 A.2d 279 (1988); see alsoTessman v. Tiger Lee Construction Co., 228 Conn. 42, 634 A.2d 870
(1993).
 VI
The defendant claims that the plaintiff failed to sustain his burden of proving by a preponderance of the evidence that Dr. Kacinski violated the standard of care. Specifically, the defendant argues that "[t]he evidence that [he] satisfied the standard of care in this case was so overwhelming that the jury's verdict must be called into question." This claim "is no more than an attempt to have this court reweigh the evidence and find facts. This we will not do." Cuneo v. Cuneo, 12 Conn. App. 702, 705,533 A.2d 1226 (1987). Because it is unlikely that this claim will be renewed on appeal, it is not discussed further.[8]
 VII
The defendant claims that the court should have granted his motion for mistrial because he was unfairly prejudiced by the plaintiff's failure to causally connect the evidence of some of the plaintiff's injuries to negligence on the part of the defendant. He claims that a mistrial was especially warranted because the court allowed certain items of evidence to go into the jury deliberation room, and did not have them removed CT Page 10721 therefrom, even though they were not tied into any claim of damages that was submitted to the jury. The items the defendant is referring to are enlarged photographs showing the disfigurement the plaintiff sustained to his leg as a result of the recurrences of sarcoma in 1995 and 1997. The court considers these claims together.
As discussed in part I, the plaintiff's principal claim — the claim that the plaintiff himself characterized as "the heart of the case" — was that the defendant's negligence caused his sarcoma to recur in 1995 and 1997, and resulted in disfiguring surgeries and other serious consequences. In support of this claim, the plaintiff testified about his multiple surgeries, the severe scarring and disfigurement to his left leg and buttock that resulted from those surgeries, and the effects that these misfortunes have had on his ability to enjoy life. He also offered several enlarged photographs of his disfigurement.
As discussed supra, the plaintiff failed to prove that the defendant's negligence caused his cancer to recur in 1995 and 1997. During the charge conference in the damages portion of the bifurcated case, after the court expressed its displeasure and concern, the defendant moved for a mistrial because the evidence of the 1995 and 1997 recurrences and the plaintiff's disfigurement was before the jury. The defendant also moved the court to have the photographs of the plaintiff's disfigurement removed from the jury room. The court denied both motions.
"A mistrial, as a general principle, should only be granted when it is apparent to the trial court that because of an incident during the trial a party cannot have a fair trial . . . The trial court has wide discretion in ruling on motions for mistrial. . . ." (Citations omitted.) Shelnitzv. Greenberg, supra, 200 Conn. 80.
Before the trial, the defendant knew what the plaintiff's evidence was with respect to his claim that there was a causative link between the 1995 and 1997 surgeries and the defendant's negligence. He neither objected to nor moved to strike the evidence — specifically, the enlarged photographs — at any time before the case was first committed to the jury for a determination of liability. "Whenever an objection to the admission of evidence is made, counsel shall state the grounds upon which it is claimed or upon which objection is made, succinctly and in such form as he or she desires it to go upon the record, before any discussion or argument is had." Practice Book §5-5; see Thomaston v. Ives, 156 Conn. 166, 175, 239 A.2d 515 (1968) (no review of admission of exhibit where not objected to). Because the defendant did not object to the evidence, it was admitted and the court was required to submit the exhibits to the jury pursuant to Practice Book § 16-15(a), which provides: "The judicial authority shall submit to CT Page 10722 the jury all exhibits received in evidence." The defendant has not cited any authority which would have allowed the court to dispatch the clerk or sheriff into the jury room and have him or her remove exhibits to which no objection had been raised.
The court did include in its charge to the jury on the damages phase of the case the following unusually strong admonishment.
 I believe that during the trial some in the courtroom may have believed that an issue in this case was whether the alleged negligence of the defendant caused directly or indirectly the plaintiff's cancer to recur in 1995 or 1997, together with all the consequences of those recurrences. I instruct you that under the law of Connecticut that was not proven. Therefore, you may not award the plaintiff damages for the recurrence of his cancer in 1995 or 1997 or for the consequences resulting from those recurrences and operations including such things as the scarring from the three surgeries, disfigurement and the effect of that on his social life and the devices he wears. The Court could not accept a verdict which included such items. You must disregard those matters.
The Supreme Court has "consistently recognized that a careful, cautionary instruction given by the trial court is a relevant factor to be considered in determining whether the denial of such a motion [for mistrial] constituted an abuse of the trial court's broad discretion." (Internal quotation marks omitted.) Shelnitz v. Greenberg, supra,200 Conn. 80. The court is not persuaded that it abused its discretion in denying the defendant's untimely motion for a mistrial.
 VIII
While he was arguing what damages the jury should award the plaintiff for the chance that he might die in the next three and one-half years, the plaintiff's attorney stated:
 MR. ERRANTE: . . . I can't give you a number. I don't really want to give you a number because it's your job, but in assessing that and trying to figure out what's fair, just and reasonable, you have to look toward other things in our society, how we measure things. And I can only give you some suggestions of things you can look at, but it's totally up to you as to how you come to that number, but I'll remind you CT Page 10723 that, you know, we have Picasso's hanging on walls for millions of dollars and we have ball players or baseball or football or basketball or whatever who make —
 MR. DOYLE: Your Honor, I'm going to object to this. Picasso's on the wall worth millions of dollars, baseball players, that's got nothing to do with this case.
THE COURT: Overruled.
MR. ERRANTE: Thank you, your Honor.
 THE COURT: I'm not saying it has anything to do with the case, but I —
MR. DOYLE: And I object, I think it's improper argument.
 THE COURT: Well, it — I think on the final claim of damages that I'm going to charge on, it's at least — it touches upon that element of damages if it's — even though it may not be directly relevant and it's I'll allow it.
The defendant asserts that these statements were improper argument and that the court erred in overruling his objection thereto. Although the type of argument made by the plaintiff has never been the subject of appellate scrutiny in Connecticut, it has been considered in other jurisdictions. In some cases, courts have held that such arguments were proper.
For example, in Betz v. Timken Mercy Medical Center, 96 Ohio App.3d 211,644 N.E.2d 1058, 1062 (1994), appeal not allowed, 71 Ohio St.3d 1436,643 N.E.2d 142 (1994), reconsideration denied, 71 Ohio St.3d 1467,644 N.E.2d 1389 (1995), which was an action for wrongful death due to medical malpractice, the court, without further discussion, held that "plaintiff's counsel's analogy to the value of a race horse during closing argument does not go outside the wide latitude afforded counsel during argument."
In Richardson v. LaBuz, 81 Pa. Commw. 436, 474 A.2d 1181 (1984), an action for wrongful death due to medical malpractice, the plaintiff's counsel rhetorically asked the jury, "What is pain and suffering?" and noted high sums paid for art, celebrities' salaries, et cetera. Id.,
1198. On appeal, the defendants contended that by referring to large sums of money, the plaintiff's counsel improperly suggested the amount of CT Page 10724 damages to the jury. The appellate court held: "The trial judge correctly overruled an objection on behalf of [the named defendant] to that mere analogy, which did not amount to a direct statement suggesting any specific sum. . . ." Id.
On the other hand, in Public Health Trust of Dade County v. Geter,613 So.2d 126, 127 (Fla.App. 1993), also an action for wrongful death due to medical malpractice, the court concluded that comments by the plaintiff's counsel during final argument that the jury, in awarding damages, "should place a monetary value on the life of the plaintiff's decedent, just as a monetary value is placed on an eighteen million dollar Boeing 747 or an eight million dollar SCUD missile — was improper, highly inflammatory, and deprived the defendant . . . of a fair trial on the issue of damages." Id.
In Goad v. Evans, 138 Ill. Dec. 523, 181 Ill. App.3d 283, 547 N.E.2d 690
(1989), appeal denied, 131 Ill.2d 559, 553 N.E.2d 395 (1990), the plaintiff brought a wrongful death action arising out the death of her son in a motor vehicle accident. In closing argument, counsel mentioned losses of cars and the worth and earnings of race horses. On appeal, the court held that [c]ounsel may suggest the amount of a total monetary award for intangible losses such as pain and suffering . . . Thus this portion of [the] closing argument was proper to the extent it suggested the appropriate amount of [the plaintiff's] damages for loss of [her son's] society and companionship. However, this argument was improper to the extent it suggested [the plaintiff's] losses were equivalent to the losses sustained by the owner of a destroyed car or were equivalent to the value of a race horse. The focus of the jury's deliberations should have been on the losses which [the plaintiff] sustained as a result of the death of her son . . . rather than on the losses sustained by owners of destroyed automobiles or the worth of race horses." Id.
In Connecticut, "[t]he trial court is invested with a large discretion with regard to the arguments of counsel." (Internal quotation marks omitted.) Skrzypiec v. Noonan, 228 Conn. 1, 15, 633 A.2d 716 (1993). The appellate courts "can interfere only where the discretion was clearly exceeded or abused to the manifest injury to some party. . . . In fact, the court must allow [c]ounsel . . . a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel . . . . In argument before the jury, counsel may comment upon facts properly in evidence and upon reasonable inferences drawn therefrom. . . . It is, thus, axiomatic that the advocate may also entreat the jury to draw reasonable inferences and conclusions from the evidence." (Citations omitted; internal quotation marks omitted.) Id.,
16. However, "[c]ounsel may not comment on or suggest inferences from CT Page 10725 facts not in evidence." Fonck v. Stratford, 24 Conn. App. 1, 4,584 A.2d 1198 (1991)
The issue posed by plaintiff's argument is not truly whether it imports facts or inferences not supported by the record, for "counsel may properly argue matters of common knowledge, and such matters may be used by jurors in drawing inferences and reaching conclusions from evidence."Haynes by Haynes v. Green, 748 S.W.2d 936, 939-40 (Mo.App. 1988). The issue is whether such an argument unduly arouses the passions of the jury or is otherwise improper.
Resolution of the issue is informed by General Statutes § 52-216b(a), pursuant to which counsel in a personal injury or wrongful death action, are entitled "to specifically articulate to the trier of fact during closing arguments, in lump sums or by mathematical formulae, the amount of past and future economic and noneconomic damages claimed to be recoverable."[9] The plaintiff's argument here was neither the articulation of a lump sum or mathematical formula. Notably, Representative Jay B. Levin, the legislator who sponsored the bill in the House of Representatives that became § 52-216b, indicated that "an appropriate basis would have to be laid" for such arguments. Bartholomewv. Schweizer, 217 Conn. 671, 680, 587 A.2d 1014 (1991). Moreover, §52-216b does not eliminate the trial court's power to exercise its judicial discretion with respect to counsel's arguments to a jury on the issue of money damages. Id., 681. In addition, even if an argument is within the ambit of General Statutes § 52-216b, it may be precluded by a trial court in the extraordinary instance where compliance with the statute would require the court to disregard its constitutional obligation to guarantee a fair trial. Bleau v. Ward, 221 Conn. 331,336-37, 603 A.2d 1147 (1992).
In light of these teachings, the court might well have exercised its discretion and sustained the defendant's objection to the plaintiff's argument. However, the plaintiff's comments, even if improper, "were isolated, brief and confined to closing arguments. Defense counsel responded. . . . The [plaintiff's] comments were not the culmination of an improper theme developed throughout the trial, nor was a pattern of misconduct discernible." State v. Pouncey, 40 Conn. App. 624, 636,673 A.2d 547, aff'd, 241 Conn. 802, 699 A.2d 901 (1996); see also Statev. Stevenson, 53 Conn. App. 551, 568, 733 A.2d 253 (1999), cert. denied,250 Conn. 917, 734 A.2d 990 (1999). For these reasons, the court concludes that the plaintiff's remarks, even if improper, do not warrant upsetting the verdict.
 IX
CT Page 10726
The defendant next claims that the court erred in failing to give the jury a supplemental instruction he submitted on the issues of proximate cause and damages.[10]
The court charged the jury:
 [Y]ou must disregard any suffering which has come to the plaintiff from other causes.
 I believe that during the trial some in the courtroom may have believed that an issue in this case was whether the alleged negligence of the defendant caused, directly or indirectly, the plaintiff's cancer to recur in 1995 or 1997, together with all the consequences of those recurrences. I instruct you that under the law of Connecticut, that was not proven. Therefore, you may not award the plaintiff damages for the recurrence of his cancer in 1995 or 1997 or for the consequences resulting from those recurrences and operations, including such things as the scarring from the 3 surgeries, disfigurement and the effect of that on his social life and the devices he wears. The court could not accept a verdict which included such items. You must disregard those matters.
(Emphasis added.)
The defendant claims that "this charge was inadequate to properly convey to the jury the limits being placed on their deliberations. The Court should have recognized that it would not be sufficient to matter-of-factly tell the jury to disregard the heart' of the plaintiff's case." The defendant further argues that the instruction "under-emphasized the significance of the Court's ruling on the jury deliberations" and that the court should have specifically instructed the jury to disregard the enlarged photographs depicting the plaintiff's scarring and disfigurement from his surgeries.
"The inherent power of a trial court to set aside a verdict because of palpable and harmful error in its charge to the jury is well settled."Trainor v. Frank Mercede Sons, Inc., 152 Conn. 364, 366-67, 207 A.2d 54
(1964). Nevertheless, "this must be done with great caution, and only if [the trial judge] is satisfied, upon an authoritative or statutory basis, that he has committed unmistakable error that has caused unquestionable harm." Sciola v. Shernow, 22 Conn. App. 351, 360,577 A.2d 1081, cert. denied, 216 Conn. 815, 580 A.2d 60 (1990) CT Page 10727
"The court is under no duty at any time to charge in the exact language requested. . . . Failure to charge precisely as proposed by a defendant is not error where the point is fairly covered in the charge. . . . Instructions are adequate if they give the jury a clear understanding of the issues and proper guidance in determining those issues." (Citations omitted; internal quotation marks omitted.) Skrzypiec v. Noonan, supra,228 Conn. 20; Barrenechea v. Lamonica, 44 Conn. App. 389, 395,689 A.2d 1137 (1997). The instruction given by the court is hardly subject to a claim of under-emphasis. To the contrary, the instruction was unusually strong, direct and, in substance, if not in detail, included what the defendant was seeking in his supplemental request to charge.
 X
The defendant claims that the court erred in charging the jury on damages by improperly emphasizing the testimony of one of the plaintiff's witnesses without mentioning the contrary testimony of the defendant's witness.
The court instructed the jury as follows:
 [T]he plaintiff claims that if the surgery had been performed in December, 1992 instead of July 1993 Brachy therapy — that radiation therapy we heard about, would not have been necessary in 1993. There was contrary evidence and the foundation or basis of that opinion was challenged on cross-examination. There was evidence that Dr. Singer would not have used Brachy therapy had he operated on the plaintiff in December 1992. There also was evidence that, had the plaintiff been operated on in December 1992, it would not have violated the standard of care to give Brachy therapy after such an operation.
The defendant excepted to the court's mention of Dr. Singer without mentioning the defendant's expert, Dr. Quinn, by name. In his motion to set aside the verdict, the defendant renews this claim. Specifically, the defendant argues: "This charge was misleading, and Dr. Kacinski took exception to it, because it failed to mention Dr. Quinn's opinions that directly contradicted Dr. Singer's testimony."
The court charged the jury further:
 If in my instructions to you I refer to one party more than the other, or do anything that in your mind CT Page 10728 suggests a preference for one side or the other, it is not done on purpose. . . .
 It is my duty and responsibility to make comments to you on the evidence, but where I do that, such comments are merely to suggest to you what point of law or what controversy I am speaking about. If I refer to certain facts or certain evidence in the case, do not assume that I mean to emphasize those facts or that evidence and do not limit your consideration to the things that I may mention. Likewise, you should attach no importance to it if I should mention one party more than the other. If I should overlook any evidence in the case, and I may, you'll supply it from your own recollection. If I incorrectly state anything about the evidence in relation to what you remember, and I may, you should apply your own recollection and correct my error.
The rule is that "[t]he court's review of the evidence in its charge to the jury is subject to the overriding consideration that its comments be fair and that they not mislead the jury, so that injustice is not done to either party. . . . [The Supreme Court has] indicated that the nature and extent of the trial court's comments on the evidence, within constitutional limitations concerning trial by jury, must largely depend on the facts involved in a particular case and the manner in which it has been tried; and the matter of commenting on evidence rests in the trial court's sound discretion. . . . Instructions should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over, portions of the testimony on the other side, which deserve equal attention. . . ." (Citations omitted; internal quotation marks omitted.) Kevin Roche-John Dinkeloo Associates v. New Haven,205 Conn. 741, 745-46, 535 A.2d 1287 (1988); see also Giannitti v.Stamford, 25 Conn. App. 67, 73-74, 593 A.2d 140, cert. denied,220 Conn. 918, 597 A.2d 333 (1991). However, "that the claims or evidence of one party are stated at much greater length than those of the other does not by itself render the court's summary of the evidence in its charge unfair." Anderson McPadden, Inc. v. Tunicci, 167 Conn. 584,592, 356 A.2d 873 (1975). Taken as a whole, the court's charge did not transgress this standard. The court clearly advised the jury that there was evidence contrary to that presented by the plaintiff. See KevinRoche-John Dinkeloo Associates v. New Haven, supra, 205 Conn. 746-48;Anderson McPadden, Inc. v. Tunicci, supra, 167 Conn. 592-94.
 XI
CT Page 10729
In addition, the defendant asserts that the court's instruction to the jury on the issue of increased risk was improperly vague and failed to adequately explain to the jury that method for calculating damages for this cause of action.
The court instructed the jury:
 [T]he plaintiff claims that because of the delay from 1992 to 1993 in diagnosing the tumor he has an increased risk of dying from cancer in the future. The plaintiff says that Dr. Vogel's opinion is that he has a certain percentage increased risk of dying from cancer for the five year period July, 1998 to July, 2003. There are about three and a half years remaining in that period.
 Again, whether this opinion or its foundation exists light of the evidence as a whole is for you to determine. You may award damages for this item only if you are satisfied that there exists the necessary causal relationship between the defendant's negligence and an increase risk of cancer that the plaintiff has.
 Since there is a claim of injury three and a half years into the future, it is well to consider the plaintiff's life expectancy, that is, whether he would live into the future in any event and what his life expectancy would be . . . Here, the plaintiff is a male, forty four years old, and the mortality tables reflect that a forty four year-old male may be expected to live another thirty point three years, to age seventy four point three. But the average length of life which the statistics show the plaintiff may expect to live is to be considered by you together with all of the evidence before you as to his overall physical condition, and physical impairment and infirmity he has in arriving at his fair expectation of life.
 If you find this claim proven, you would have to determine what fair, just, and reasonable compensation would be for the destruction of the plaintiff's ability to carry on and enjoy life's activities. of course, assessing damages for the loss of life defies any precise mathematical computation. In making this CT Page 10730 determination, you may not include or consider the loss of the plaintiff's earnings or earning capacity, emotional loss of his relatives, fear of dying, pain and suffering, medical expenses or funeral expenses. Your task would be to determine what fair, just, and reasonable compensation would be for the destruction of the plaintiff's ability to carry on and enjoy life's activities. That, however, would not be your award. Rather, you would have to apply to that figure whatever you determine to be the percentage increased risk, if any, he has of dying in the next three and a half years because of the defendant's breach of the standard of care. And, of course, in making any determination, you would be bound by the evidence.
The defendant argues that "[t]he charge failed to make clear the distinction between plaintiff's risk of dying because he has had cancer and [the] plaintiff['s] increased risk of dying that was proven to have been caused by Dr. Kacinski's conduct." (Emphasis in original.) Although this claim is moot in light of the court's determination that the evidence supporting the claim of increased mortality was inadequate underPetriello v. Kalman, supra, 215 Conn. 377, to support a verdict, the court reviews this claim in the event that a reviewing panel disagrees with that determination.
In reviewing jury instruction, Connecticut courts "adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total. effect rather than by its individual component parts . . . [The courts] do not critically dissect the charge in order to discover possible inaccurate statements. . . . Rather, [they] see if [the jury instructions] gave the jury a reasonably clear comprehension of the issues presented for their determination under the pleadings and upon the evidence and were suited to guide the jury in the determination of those issues . . . Even if instructions are found to be improper, [the court] must further determine whether they have been prejudicial to the claiming party by adversely affecting the trial's outcome." (Citations omitted; internal quotation marks omitted.) Blanchette v. Barrett, supra, 229 Conn. 280-81. The court told the jury that the plaintiff's claim was for "an increased risk of dying from cancer in the future." The court used the word "increased" four times in the above-quoted instruction. That would seem to be sufficient emphasis.
The defendant also argues that:
 It was ambiguous and vague for the Court to instruct CT Page 10731 the jury to `apply' the percentage of increased risk to the amount determined to be fair, just and reasonable damages for the plaintiff's loss of life's enjoyment. Instead, the Court should have instructed the jury that it was required to reduce' the damages accordingly, and that [the] plaintiff would only [be] entitled to that fraction of the damages consistent with the percentage of risk. By doing so, the Court would have avoided misleading the jury as to the method of calculating increased risk damages.
The court's notes do not reflect that the defendant took exception to this aspect of the charge, either at the charge conference or after the charge was delivered to the jury. Moreover, the word "apply" was adopted from Petriello v. Kalman, supra, 215 Conn. 397, wherein the court stated: "The probability percentage for the occurrence of particular harm, the risk of which has been created by the tortfeasor, can beapplied to the damages that would be justified if that harm should be realized." (Emphasis added.)
Finally, the defendant claims that the court should have mentioned that defendant's evidence contradicted Dr. Vogel. Under the standard requiring that the court's review of the evidence must be fair and not misleading, this claim is unpersuasive. See Kevin Roche-John Dinkeloo Associatesv. New Haven, supra, 205 Conn. 746-48; Anderson McPadden, Inc. v.Tunicci, supra, 167 Conn. 592-94. The court is not required to discuss contrary evidence every time it mentions one party's evidence. Id., 592.
 XII
In his motion for remittitur, the defendant argues that even if the jury could have awarded damages to the plaintiff, the $1,400,000 awarded to the plaintiff for damage to his sciatic nerve is clearly excessive because that damage must be considered temporary. The court agrees that the award is excessive.
As discussed in part III, the jury could have reasonably formed a reasonable belief that the 1993 brachytherapy was a proximate cause of numbness in the plaintiff's foot and his difficulty in walking before the 1995 surgery and ending in 1997. In addition to the testimony quoted in part III, supra, the following exchange occurred between the plaintiff and his attorney:
 Q: And was it having any effect on your ability to perform your job? CT Page 10732
 A: I tried my best. I think I still was doing a pretty good job. I would not go to an arena in the wintertime unless they had underground parking. I tried, and fell. One time going to New York, Madison Square Garden, they don't have parking inside. I took a real bad fall in New York, and I discussed it with my boss and he was very patient with, you know, with that limitation. The other thing was going to conventions. A lot of the comradery that I enjoyed, friendship with these guys, you know, whether it be golf, tennis any activities was limited. It would be limited to, you know, the meeting themselves where you're sitting most of the time. And even the cocktail receptions became a challenge because [of] the standing. And by that time, I be believe I was wearing a brace, which I still wear today.
Q: How old are you today, Mr. Cohen?
A: Forty four.
"Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right is one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court. . . . The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. . . . The size of the verdict alone does not determine whether it is excessive. The only practical test to apply . . . is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption. . . ." (Citations omitted; internal quotation marks omitted.)Gaudio v. Griffin Health Services Corp., supra, 249 Conn. 550-51. "Notwithstanding the highly deferential standard set forth previously, [a] verdict may be excessive if it includes an award for an element of damages which was not proven. . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty." (Citations omitted; internal quotation marks omitted.) Id., 554. In addition, General Statutes § 52-216a
provides; "It the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial." CT Page 10733
After a thorough and repeated review of the evidence in the record, this court is constrained to conclude that the award is not supported by the evidence and shocks the sense of justice. The injuries to the plaintiff ascribed to brachytherapy, although substantial and deserving of significant damages, terminated in 1997. Moreover, the function of the plaintiff's foot was not completely destroyed for the four year period from 1993 to 1997. According to the evidence, the function gradually deteriorated between 1993 and 1995. Notably, there was no claim for or evidence of economic damages. Barry v. Posi-Seal International, Inc.,40 Conn. App. 577, 582, 672 A.2d 514, cert. denied, 237 Conn. 917,676 A.2d 1373 (1996); compare Grayson v. Wofsey, Rosen, Kweskin Kuriansky, 231 Conn. 168, 184, 646 A.2d 195 (1994). The court concludes that the verdict is excessive as a matter of law.
"When a verdict is excessive as a matter of law, the amount of the remittitur . . . . rests largely within the discretion of the trial court." A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 218,579 A.2d 69 (1990); accord Morales v. Pentec, Inc., 57 Conn. App. 419,749 A.2d 47 (2000). "In ordering of a remittitur, a fair appraisal of compensatory damages, and not the limit of legitimate generosity, is the rule. Allen v. Giuliano [144 Conn. 573, 578, 135 A.2d 904 (1957)]."Buckman v. Peoples Express, Inc., 205 Conn. 166, 177, 530 A.2d 596
(1987). That is, in ordering a remittitur, the court is obligated to determine damages de novo and not merely bring the verdict just "within the ballpark." A fair, just and reasonable appraisal of compensatory damages for the injury to the plaintiff on account of the 1993 brachytherapy of which the jury could find the defendant's negligence was a substantial factor is $375,000.
The jury's award of damages for increased mortality is set aside for the reasons discussed in part IV, supra.[11] With respect to the jury's award of $1,400,000 for damages to the plaintiff's sciatic nerve because of brachytherapy, the plaintiff is ordered to remit $1,025,000. Unless the plaintiff files a notice with the court accepting this order of remittitur within thirty (30) days of the date of this order, the verdict shall be set aside and a new trial ordered, limited to the issue of what is fair, just and reasonable compensation to the plaintiff for damage to his sciatic nerve which the jury found was proximately caused by the defendant's breach of the standard of care, i.e., which resulted from the brachytherapy.
The defendant's motions to set aside the verdict, for a new trial and for judgment notwithstanding the verdict are otherwise denied.
BY THE COURT CT Page 10734
Bruce L. Levin Judge of the Superior Court